**Helen LOUROS and Rose Louros, Plaintiffs,**

v.

**Arnold CYR, Lynn Cyr, Douglas Johnson, Ken Adler, James Sexton, Kevin McGeever and H. Freeman Wilkinson Defendants.**

**No. 00 CIV 2166 LAP.**

United States District Court, S.D. New York.

April 17, 2001.

Kostas T. Golfinopoulos, New York, NY, Steven Louros, New York, NY, for Helen Louros, Rose Louros.

Lawrence Banigan, Hill & Associates, New York, NY, for Arnold Cyr, Lynn Cyr, Ken Adler.

Eugene Novy, Deborah M. Vaughan, Novy, James & Vaughan, Atlanta, GA, for H. Freeman Wilkinson.

## MEMORANDUM AND ORDER

PRESKA, District Judge.

Plaintiffs, Helen and Rose Louros ("plaintiffs"), bring this diversity action against Arnold Cyr, Lynn Cyr, Ken Adler, H. Freeman Wilkinson, James Sexton, Douglas Johnson and Kevin McGeever, claiming fraud, breach of contract, conversion, unjust enrichment, breach of fiduciary duty, violations of New York State Banking and General Business laws, negligence and civil RICO. Defendants Arnold Cyr, Lynn Cyr,[1] Ken Adler and H. Freeman Wilkinson ("defendants") move to dismiss the second amended complaint (the "Complaint") pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim. In addition, defendant H. Freeman Wilkinson moves to dismiss the Complaint against him for lack of personal jurisdiction pursuant to Fed.R.Civ.P. 12(b)(2) and for improper venue pursuant to Fed.R.Civ.P. 12(b)(3). For the reasons set forth below, the motion is granted with respect to

1. It does not appear that plaintiffs have alleged any claims against defendant Lynn Cyr other than making conclusory statements that she was a member of the Global Trust Management Team (Compl. ¶¶ 3, 5, 11, 13, 18) and that prior to February 1999, she and others solicited investors in New York via postcards, facsimile transmissions and telephone calls (*id.* ¶ 20). Because defendant does not raise this issue, I do not further address it as this time.

Claims Seven, Eight, Nine and Ten and denied with respect to Claims One, Two, Three, Four, Five and Six.

## BACKGROUND [2]

Despite plaintiffs' somewhat convoluted and confusing presentation of the facts, on a motion to dismiss, I accept as true plaintiffs' recitation of the facts. In September or October 1998, H. Freeman Wilkinson contacted Douglas Johnson and Kevin McGeever about establishing a private bank in the country of Liechtenstein. (Compl., Ex. D). Wilkinson stated that this bank would be a branch of a larger, existing Liechtenstein bank, and would be able to offer all the services of a private bank, including debit cards and internet banking. (*Id.*). Wilkinson "pointed out that Liechtenstein was the best off-shore scenario from a security and confidentiality standpoint." (*Id.*). The goal for Johnson and McGeever was to "place funds into a[n] [investment] program once they were aggregated to $10 million." (*Id.*). For the depositor, banking in Liechtenstein would offer "personal attention," "individualized services to each client," a "dollar for dollar" guarantee on all deposits and "tax-free interest income." (*Id.*, Ex. E).

In order to set up a private bank, Wilkinson stated that it was necessary to have a contact who had a connection to the Liechtenstein government; this contact was James Sexton. (Compl., Ex. D). For a fee of $25,000, Sexton set up "the whole bank structure" for Johnson and McGeever. (*Id.*). The original idea was to establish the bank as a "trust entity under [Verwaltungs und Privat Bank] and the trust would have a main account with VP Bank and individual, depositor controlled, sub-accounts to the main account for individual depositors." (*Id.*).

Under this scenario, Johnson and McGeever were the "creators" of the bank, (*id.*, Ex. M); Ken Adler marketed and administered the program by attracting depositors and acting as the conduit for the required paperwork and communications; and Wilkinson handled the individual account balances and monthly statements (*id.*, Ex. D). Sexton required all prospective depositors to submit bank reference letters and passport information as well as a completed power of attorney forms appointing Sexton attorney-in-fact for the sole purpose of establishing the bank accounts in Liechtenstein. (Compl., Ex. D, *id.*, Ex. I). Together, these individuals formed the Global Trust Management Team, and the bank was named the Global Trust Bank.

On or about December 17, 1998, Arnold Cyr called Rose Louros and stated that he had established an agreement between an entity he controlled, Levite Holdings, and a Liechtenstein bank. (*Id.* ¶ 26(a)). Under this arrangement, Cyr stated, Rose and Helen Louros would have individual bank accounts with "the Liechtenstein Bank," "full control over [their] funds at all times," and their "funds would not be moved, liened, hypothecated or encumbered in any way." (*Id.*). Cyr's call was followed by a faxed memorandum confirming the aspects of the arrangement. (*Id.*, Ex. J.). On December 22, 1998, Arnold Cyr called Helen Louros again and stated that "he had become part of the Global Trust Management Team and that all of plaintiffs' accounts and transactions would be through Global Trust Bank (not Levite Holdings)." (Compl., ¶ 26(c)). Cyr also gave plaintiff instructions of how to wire money to Global Trust Bank in Liechtenstein. (*Id.*; *id.*, Ex. G). Cyr assured Rose

**2.** Many of the facts are taken from the signed April 30, 1999 statement by defendants John- son and McGeever, which is attached to the Complaint as Exhibit D.

Louros that each depositor's funds would be placed in a separate account; that the principal in the account was 100% guaranteed; that the depositor would have sole control over the account and could withdraw the principal at any time; that the funds would be used for a high yield investment program that was to begin in February 1999; and that no funds would be moved without the depositor's written consent. (*Id.* ¶ 26(c)(i)-(iv)). The high yield investment program was to last three months after which "Investors could roll over their deposits into another high yield investment program at Global Trust Bank." (*Id.,* ¶ 26(e)(ii)).

Rose and Helen Louros completed powers of attorney naming James Sexton attorney-in-fact on December 18, 1998 and December 31, 1998, respectively. (Compl., Ex. I). As of January 4, 1999, Rose Louros had an account balance of $251,385. She instructed Arnold Cyr to roll $201,382 into the "Liechtenstein program" and to wire $50,000 back to her account at a bank in Los Angeles, California. (*Id.,* Ex. P).

As of January 31, 1999, Helen Louros had almost $141,000 on deposit. (*Id.,* Ex. N). In an undated letter to Helen Louros, Ken Adler stated that Account #10 had been established for Helen Louros and that she had a balance of $140,372.31. He enclosed with the letter "an automatic funds transfer form ... to move a set percentage of [depositor's] 'HOLDING ACCOUNT' funds into [depositor's] 'ACTIVE ACCOUNT,'" and stated that a welcome pack, withdrawal request form and pin code authorization form would be sent under separate cover. (*Id.,* Ex. F).

In December 1998 or January 1999, the arrangement with VP Bank ended, allegedly because a prospective depositor had called VP Bank directly to question the existence and structure of the Global Trust Bank. (*Id.,* Ex. D). VP Bank apparently

"took offense" to this call and viewed it as a "major breach of security." (Compl.Ex. D). Thereafter, Sexton established a relationship with a trust at another Liechtenstein bank called Landesbank. (*Id.*). In a phone call among Sexton, Johnson and McGeever, Sexton stated that initially the funds would be deposited in a trust called P.B. Global Investments and would then be transferred to a new trust that Sexton would establish. (*Id.*). "[U]nder the new scenario, all funds would be deposited into one account and ... [Adler and Wilkinson] would have to keep track of individual depositor's balances as a separate ledger until the new banking relationship was set up by Sexton." (*Id.*). Adler "was notified that he could no longer represent the entity as 'Global Trust Bank'" and was instructed to change the paperwork. (*Id.*). The paperwork was changed to read "Global Trust Limited, Global Investments, Ltd.," and Adler continued to solicit new depositors.

Despite the fact that under the arrangement with Landesbank all the money would be deposited into one account, defendants repeatedly assured plaintiffs that their funds were deposited in individual accounts. On January 26, 1999, Adler faxed a memorandum to Rose and Helen Louros which stated that the Global Trust Management Team had established the Global Trust Limited Bank d/b/a Global Investments, Ltd.; that the bank was "a trust affiliate of Landesbank;" that plaintiffs funds were deposited in separate accounts; and that all deposits were guaranteed, dollar for dollar. (Compl.¶ 26(g)(i)—(vi); *id.,* Ex. E). On or about February 17, 1999, Cyr and Adler met with Rose Louros in New York to solicit her participation in high yield investment programs. (*Id.* ¶ 20). In February 1999, in a telephone call to Rose Louros, Johnson and McGeever reiterated that her funds were

on deposit in an individual, separate account; that her funds were 100% guaranteed; that they would be used for a high yield investment program; that plaintiff had sole control over her account; and that her funds would not be moved without her express written permission. (*Id.* ¶ 26(d)).

According to Johnson and McGeever, in January 1999, Landesbank started rejecting wire transfers allegedly because "once again, someone had contacted the bank and/or sent a letter or documentation which caused the bank to discontinue deposits." (*Id.*, Ex. D). By letter dated February 10, 1999, the Global Trust Management Team notified depositors that "the trade [the Management Team] authorized ran into problems having to do with [the Liechtenstein] privacy laws." (Compl., Ex. K). Defendants further stated, however, that the problems had been corrected and that they "ha[d] found the proper path to take and . . . ha[d] committed to a trade, which should start in the next seven to ten business days." (*Id.*, Ex. K). The letter concluded with a request for patience and cooperation as defendants tried to resolve the situation.

> You are a valued participant and your patience, cooperation and understanding are greatly appreciated! All of the trial and tribulations, which we have gone through, are for your benefit. Once again, I ask you to hang in there. . . . .
> The reward is just around the corner and I am sure you will be pleased.

(*Id.*) (ellipses in original). There is no allegation that any trade was ever consummated.

On March 14, 1999, Wilkinson sent a letter to depositors explaining that an eight-week program the Management Team had thought was a "tremendous opportunity" had "changed dramatically." (*Id.*, Ex. Q).

> Unfortunately, all promises of a contract have fallen short and the behavior of several of the Facilitating Group[3] representatives has been less than professional in addition to being outright unethical. . . . Due to the constant misrepresentations by the Facilitating Group of this Program, should you receive a contract from this Facilitating Group, please know that we do not endorse, recommend [or] support it in any way.

(*Id.*). Wilkinson then stated that the Management Team had located another program, "which we believe will meet the goals and objectives of all Participants" and if participants are interested, "efforts will be made with the Trading Group[4] to the [sic] accept [participants'] previously submitted paperwork." (Compl., Ex. Q). The letter concluded:

> We look forward to doing our best on your behalf and we know that you rely on us to be both ethical and professional. Please know that this situation, while not normal, is becoming more prevalent within our business. We will continue to fight all unethical behaviors and when applicable, will report our findings to the various governmental authorities for their review and subsequent action. . . . Thank you for your confidence and trust. We pledge to do our best on your behalf.

(*Id.*).

At the same time, in March 1999, Sexton suggested that an independent audit be performed on the deposits. Wilkinson arranged for an accounting firm he knew to conduct the audit. (*Id.*, Ex. D). The firm

---

**3.** It is unclear what or who is the Facilitating Group.

**4.** It is unclear what or who is the Trading Group.

sent affidavits to all depositors to complete, have notarized and return to the firm. (*Id.*). However, when a depositor allegedly called the firm asking questions, it "caused [the firm] to become nervous about continuing the audit." (*Id.*). Wilkinson then arranged through Sexton to have an accounting firm in Liechtenstein do the audit.

On March 22, 1999, Adler faxed a letter to Helen Louros (who subsequently faxed it to Rose Louros) stating that the affidavits have been forwarded to the "Audit Group" in Liechtenstein and that a meeting would be held on March 25, 1999 with "all the relevant parties involved with the return of funds, including Landesbank." (Compl., Ex. L).

On March 29, 1999, Adler again faxed a letter to Helen Louros explaining that

> the current situation has been caused by one individual. This individual represented one entity, which deposited funds into Global. The laws of Liechtenstein are quite clear with respect to privacy in banking and the contact by this individual has caused enough concern on the part of Landesbank that Landesbank has taken full control of all funds, pending the outcome of an independent audit and investigation.

(*Id.*, Ex. M). The letter further assured the depositors that "[a]ll funds are safe and the matter will be resolved." (*Id.*). However, the letter cautioned depositors not to contact Landesbank directly as this

> would probably create additional delays. Remember, that the Laws of Liechtenstein are quite clear with respect to privacy in banking. That is why a single individual was able to create this situation in the first place.... Additionally, remember that we have identified the individual who created this mess and we intend to release his information

to all participants at the appropriate time.

(*Id.*). Further, in "numerous" telephone calls during March, April and May 1999, Arnold Cyr, Douglas Johnson and Kevin McGeever repeatedly stated that plaintiffs' funds were on deposit in Liechtenstein, were safe and would be returned. (*Id.* ¶ 26(*o*)).

Finally, when Wilkinson attempted to get information from Sexton about another meeting with the bank allegedly held on April 5, 1999, Sexton refused to have further contact with Wilkinson and told him "that if [Wilkinson] had any other questions to call [Sexton's] lawyer." (Compl., Ex. D). When Johnson and McGeever tried to contact Sexton, he told them that Wilkinson knew everything he knew and that Johnson and McGeever should speak to Wilkinson or Sexton's lawyer. (*Id.*). Thereafter, Wilkinson told Johnson and McGeever that they should direct further communications to Wilkinson's attorney. (*Id.*). On April 30, 1999, Johnson and McGeever signed a statement setting forth the details of the Global Trust Management Team transaction. *See id.*

Plaintiffs filed a complaint on March 22, 2000. An amended complaint was filed on July 20, 2000. A second amended complaint was filed on September 12, 2000, and a corrected second amended complaint, the subject of this motion, was filed on October 12, 2000.

## DISCUSSION

### I. STANDARD UNDER 12(b)(6)

In deciding a motion to dismiss, I must view the Complaint in the light most favorable to the plaintiff. *Scheuer v. Rhodes,* 416 U.S. 232, 237, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Yoder v. Orthomolecular Nutrition Inst., Inc.,* 751 F.2d 555, 562 (2d Cir.1985). I must accept as true the

**508**

factual allegations stated in the Complaint, *Zinermon v. Burch*, 494 U.S. 113, 118, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990), and draw all reasonable inferences in favor of plaintiff, *Scheuer*, 416 U.S. at 236, 94 S.Ct. 1683; *Hertz Corp. v. City of New York*, 1 F.3d 121, 125 (2d Cir.1993). A motion to dismiss can only be granted if it appears beyond doubt that plaintiff can prove no set of facts in support of its claim which would entitle it to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

## II. RICO CLAIM (COUNT TEN)

■ Defendants contend that plaintiffs allege fraud in the purchase of securities through a "high yield investment program" as the basis of their Racketeer Influenced and Corrupt Organizations ("RICO") claim and, therefore, this claim is barred by 18 U.S.C. § 1964(c). Section 1964(c) states in relevant part:

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue thereof ... except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962.

In the Complaint, plaintiffs allege upon information and belief that in 1997 Cyr and a woman named Laurie Stonebreaker "solicited individuals throughout the United States and/or New York State to enter high yield investment programs known as trading programs." (Compl. ¶ 91). In July 1998, Cyr allegedly solicited Rose Louros to wire approximately $70,000 to a trust account called "Investbada" in Utah in order to participate in a trading program. (*Id.* ¶ 94). Plaintiffs further allege that in October 1998, Cyr "induced [Rose Louros] to wire approximately [another] $40,000 to an account designated by ... Cyr to enter

the trading program." (*Id.* ¶ 95). Cyr then allegedly induced Rose Louros to roll over "the principal and profit she allegedly obtained from the trading program into the Global Trust Management Team's Liechtenstein program." (*Id.* ¶ 97). Plaintiffs claim that these acts constitute a pattern of racketeering under 18 U.S.C. §§ 1961(1)(D) and (5) and as a result defendants violated the RICO Act pursuant to 18 U.S.C. § 1962.

Plaintiffs' RICO claim cannot be sustained. As a preliminary matter, only defendant Arnold Cyr and an individual who is not a party to this action are alleged to have violated the RICO statute based on actions taken before the incidents at issue here. In addition, the structure of the investment program described in Claim Ten is distinctly different from the Liechtenstein banking scheme. In any event, plaintiffs fail to allege a RICO violation.

■ In contravention to § 1964(c), plaintiffs base their claim on an alleged fraud in the purchase of securities. While § 1962 does not define "security," the Securities Exchange Acts of 1933 and 1934 define a security to include an "investment contract." 15 U.S.C. § 77b(a)(1); 15 U.S.C. § 78c(a)(10).

> [A]n investment contract ... means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from efforts of a promoter or third party.... [The definition] embodies a flexible rather than a static principle, one that is capable of adaptation to meet countless and variable schemes devised by those who seek the use of the money of others on the promise of profits.

*Securities and Exchange Commission v. W.J. Howey Co.*, 328 U.S. 293, 298–99, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). The transaction alleged in the Complaint meets

this definition. Cyr allegedly solicited Rose Louros to transfer approximately $110,000 into designated accounts in order to participate in a trading program. Presumably, Rose Louros was to receive profits from the efforts of Cyr in this common enterprise.

In response to defendants' motion to dismiss the RICO claim, plaintiffs simply state without argument that "[s]ince this case do[es] not involve the purchase and sale of securities, defendants['] motion should be denied." (Pl. Mem. at 14). In their Complaint, plaintiffs cite 18 U.S.C. § 1961(1)(D) as the basis of their claim that defendant Cyr engaged in racketeering activity. Section 1961(1)(D) states that racketeering activity means "any offense involving fraud connection with a case under title 11 [Bankruptcy], fraud in the sale of securities, or the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed chemical. . . ." 18 U.S.C. § 1961(1)(D). The only possible basis of plaintiffs' RICO claim pursuant to § 1961(1)(D) is fraud in the sale of securities. As discussed above, however, under § 1964(c), fraud in the purchase or sale of securities may not establish the basis of a private action under RICO. Accordingly, plaintiffs' RICO claim (Count Ten) is dismissed.

## III. FRAUD CLAIM (COUNT ONE)

### A. The Pleading

■ Defendants argue that plaintiffs' fraud claim is also barred by § 1964(c) because plaintiffs "merely reallege[ ] the same facts of the securities fraud allegations contained in Count 10 (RICO)." (Def. Mem. at 2). This argument may not be sustained as it ignores the facts alleged in the Complaint. Plaintiffs claim that defendants made the following false representations:

1. Defendants stated that they had established a bank called Global Trust Limited Bank that was branch of Landesbank in Liechtenstein.

2. The powers of attorney appointing Sexton attorney-in-fact were solely to enable Sexton to open plaintiffs' bank accounts in Liechtenstein.

3. Defendants solicited plaintiffs to deposit over $340,000 and stated that these funds would be deposited into individual accounts in the bank and that plaintiffs would receive "comprehensive and unsurpassed asset management services."

4. Defendants stated that plaintiffs' funds were 100% guaranteed, dollar for dollar, that plaintiffs would have exclusive and full control over their funds, and that the funds would not be moved or transferred without plaintiffs' written consent.

5. Defendants stated that they had the knowledge, ability and experience to assist plaintiffs in gaining access to a high yield investment program or reserve funds program.

6. Defendants stated that if plaintiffs deposited at least $100,000, they would be eligible to participate in a high yield investment program, and after three months could roll their deposits into another high yield investment program.

7. Defendants stated that plaintiffs' funds were safe and that plaintiffs could withdraw their funds at any time.

(Compl.¶¶ 30(a)-(aa)). Additionally, plaintiffs claim that in March, April and May 1999, Arnold Cyr, Douglas Johnson and Kevin McGeever stated in numerous phone calls that plaintiffs' money was safe and would be returned. (*Id.* ¶ 26(*o*)). Further, plaintiffs demanded return of their

funds, but defendants refused. (*Id.* ¶¶ 62, 67). Construing these allegations in the light most favorable to the plaintiffs, they do not describe a purchase or salé of securities, but rather a scheme to deposit money in a bank. Thus, plaintiffs do not realllege that same facts as those alleged in Count Ten.

### B. Standard Under Fed.R.Civ.P. 9(b)

Defendants next argue that plaintiffs fail to plead the fraud claim with sufficient particularity as required by Fed.R.Civ.P. 9(b). For the reasons stated below, defendants' motion to dismiss the fraud claim is denied.

■ Fed. R. Civ. Proc. 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. Proc. 9(b). " '[T]he complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.' " *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 51 (2d Cir.1995) (quoting *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993)).

■ Rule 9(b) provides that " '[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally.' " *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994) (change in original). The Court of Appeals noted in *Shields* that

> since Rule 9(b) is intended "to provide a defendant with fair notice of plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit," the relaxation of Rule 9(b)'s specificity requirement for scienter "must not be mistaken for license to base claims of

> fraud on speculation and conclusory allegations."

*Id.* (internal quotation marks and citations omitted). Thus, in order to give meaning to Rule 9(b)'s purpose, plaintiffs are required "to allege facts that give rise to a strong inference of fraudulent intent." *Id.; see also Chill v. General Elec. Co.,* 101 F.3d 263, 267 (2d Cir.1996). A "strong inference" can be shown either "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Shields,* 25 F.3d at 1128; *see also Chill,* 101 F.3d at 267.

### 1. Application

■ Plaintiffs plead the fraud claim with sufficient particularity. The Complaint describes numerous alleged statements made by defendants and attaches as exhibits several written communications from defendants promising to deposit plaintiffs' money in individual bank accounts and guaranteeing the security of the principal. The Complaint also identifies the speakers both as to specific allegations and in the exhibits, and adequately states where and when the statements were made. For example, many of the faxed communications from defendants contain fax lines detailing from whom, where and when the communication was sent. *See* Compl., Exs. G, I, L, M, N, O, P, Q. Plaintiffs also allege that the defendants knew that their various representations were false and intended to defraud and deceive plaintiffs in order to induce plaintiffs to transfer their money to defendants. (*Id.* ¶¶ 33, 34).

Plaintiffs also establish a strong inference of fraudulent intent by alleging facts showing both motive and opportunity to commit fraud. While defendants' goal was

to aggregate at least $10 million to invest in a trading program, depositors were told that they would receive all the benefits of private banking in Liechtenstein, including secure, individual accounts and tax-free interest. Plaintiffs were also told that if they deposited at least $100,000, they would be eligible to participate in a "high yield investment program and/or a reserved funds program." (Compl. ¶ 26(e)(i)). The bank was to be structured as a branch of VP Bank, an established Liechtenstein bank. However, when VP Bank withdrew from the arrangement allegedly because it "took offense" by a depositor who contacted the bank directly inquiring about Global Trust Bank, defendants quickly switched their operation to Landesbank. Under the arrangement with Landesbank, "all funds would be deposited into one account and [Adler and Wilkinson] would have to keep track of individual depositor's balances as a separate ledger until" Sexton set up yet another "banking relationship." (Id., Ex. D). Plaintiffs, however, were not told that the funds were aggregated in one account. Landesbank, too, grew concerned when "someone" contacted the bank directly, "which caused the bank to discontinue accepting deposits" and to take control of all the funds. (Id.). Defendants told plaintiffs that their funds were safe and that Landesbank had taken control over the funds "in order to protect" the depositors. (Id., Ex. A). Defendants also made several veiled threats to deter depositors from contacting Landesbank directly by stating that "any contact with Landesbank would probably create additional delays" in resolving the matter and by reminding depositors that defendants "have identified the individual who created this mess and

we intend to release his information to all participants at the appropriate time." (Id.).

Plaintiffs were told their funds would be returned after an audit was conducted. However, after a depositor called the accounting firm, the auditors "became nervous about continuing the audit," and defendants had to commission an audit by an accounting firm in Liechtenstein. Finally, plaintiffs claim that their money was never returned and that Sexton and Wilkinson would only speak through their attorneys. These allegations are sufficient to infer defendants' fraudulent intent.

Plaintiffs have adequately alleged a claim for fraud. Accordingly, defendants' motion to dismiss Claim One is denied.

## IV. BREACH OF CONTRACT (COUNTS TWO AND THREE)

▮▮ Defendants argue that the breach of contract claims are barred by the Statute of Frauds because there is no written contract between the parties and any oral or implied-in-fact contract could not be performed within one year. These arguments are without merit. While plaintiffs do not allege that there was a single, signed agreement, any reasonable reading of the Complaint and the exhibits attached thereto alleges a valid written contract between the parties.[5] Under New York law, a written contract "may consist of several documents only some of which are signed, provided that they clearly refer to the same transaction." *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir.1984), citing *Weitnauer Trading Co. v. Annis*, 516 F.2d 878, 880 (2d Cir.1975); *Crabtree v. Elizabeth Arden*

---

5. To form a valid contract under New York law, there must be an offer, acceptance, consideration, mutual assent and intent to be bound. *Oscar Productions, Inc. v. Zacharius*, 893 F.Supp. 250, 255 (S.D.N.Y.1995). Defen- dants do not argue that these elements are not met. Rather, they argue that the Statute of Frauds bars enforcement of the agreement between the parties.

*Sales Corp.*, 305 N.Y. 48, 110 N.E.2d 551 (1953). *See also Springwell Corp. v. Falcon Drilling Co.*, 16 F.Supp.2d 300, 303 (S.D.N.Y.1998) (Sotomayer, J.) ("[A] sufficient writing under the Statute of Frauds may be established by a combination of signed and unsigned documents, letters or other writings provided at least one writing, the one establishing a contractual relationship between the parties, must bear the signature of the party to be charged (or his authorized agent), while the unsigned document must on its face refer to the same transaction as that set forth in the one that was signed.") (citations and internal quotation marks omitted).

■ The multiple written communications between the parties satisfy the Statute of Frauds. On or about December 17, 1998, Arnold Cyr sent plaintiffs a signed letter giving an overview of the arrangement between his company, Levite Holdings, and a Liechtenstein bank. The letter stated, among other things, that Levite had arranged for depositors to open individual bank accounts in Liechtenstein, depositors would have "full control of the funds" and the "funds [would] be electronically verified ... without moving, hypothecating or encumbering the funds in any way." (Compl., Ex. J). On December 22, 1998, Cyr called Helen Louros and stated that "he had become part of the Global Trust Management Team and that all of plaintiffs' accounts and transactions would be through Global Trust Bank (not Levite Holdings)." (*Id.* ¶ 26(c)). Cyr then sent Rose Louros written instructions how to wire money to Global Trust Bank in Liechtenstein. (*Id., id.,* Ex. G). In response to Cyr's solicitation, plaintiffs' wired over $340,000 to defendants and executed powers of attorney to enable Sexton

to open bank accounts on their behalf. Defendants promised in writing, among other things, that: 1) the funds would be deposited in individual accounts; 2) the principal would be guaranteed dollar for dollar; and 3) depositors would receive tax-free interest. (*Id.,* Exs. E, O). Additionally, defendants sent plaintiffs letters evidencing defendants' knowledge of plaintiffs' reliance and providing assurances of defendants' intent to perform.[6] For example, in March 1999, Wilkinson sent plaintiffs a letter stating, "We look forward to doing our best on your behalf and we know that you rely on us to be both ethical and professional." (Compl.Ex. Q). Thus, as alleged in the Complaint, taken together the written communications between the parties establish a valid written contract.

■ Defendants next argue that even if an implied-in-fact contract is found, it is barred by the Statute of Frauds because the plaintiffs allege that "the contract was ongoing "from 1997 to the filing of the complaint." " (Def. Mem. at 13). This argument cannot be sustained. Under New York General Obligations Law § 5–701, any contract that by its terms cannot be performed within one year is void unless evidenced in writing and signed by the party to be charged. N.Y. Gen. Oblig. § 5–701(a)(1). "The law is well-settled that for a contract to fall within this provision of the Statute of Frauds, there must be absolutely no possibility of performance of the contract within one year." *Riley v. N.F.S. Services, Inc.*, 891 F.Supp. 972, 975 (S.D.N.Y.1995), citing *Ohanian v. Avis Rent A Car System, Inc.*, 779 F.2d 101, 106 (2d Cir.1985), in turn citing 2 Corbin on Contracts § 444, at 535.

---

6. Several of the written communications do not have signatures, although the author's name or "Global Trust Management Team" is typewritten on the letter and the letter is written on "Global Trust Limited" letterhead. *See e.g.,* Compl., Exs. A, L, M, O.

■ The Complaint alleges that plaintiffs were solicited in or about December 1998 to deposit funds in a newly-formed bank in Liechtenstein and in exchange would receive all the various private banking benefits. Plaintiffs wired funds to defendants in Liechtenstein and executed powers of attorney in December 1998. The asserted promises made by defendants, including establishing and administering the bank accounts, were alleged to be performed immediately upon receipt of the funds and powers of attorney.

The only term that defendants note that possibly gives rise to a Statute of Frauds defense is defendants' promise to invest the funds in a high yield investment program. Defendants argue that "plaintiffs continuously and consistently state in their pleadings . . . that the trading program was not finished with in [sic] three months, but was ongoing with no termination date except by the choice of the plaintiffs." (Def. Reply ¶ C). Defendants cite ¶¶ 26(b) and (c)(i) of the Complaint. Defendants' argument is misleading. Paragraphs 26(b) and (c)(i) do not mention an investment program at all. Paragraph 26(b) states:

> In a telephone conversation on or about December 17, 1998, Arnold Cyr stated to plaintiff, Rose that the Investors should execute powers of attorney to James Sexton . . . for the sole purpose of establishing their individual bank accounts; that each plaintiff would have an individual account in their own names and/or in the name of an individual designated by plaintiffs; and plaintiffs would have full control over their funds at all times, that the power of attorney would only be used by defendant Sexton to set up plaintiffs['] account. He confirmed these verbal statements in an undated letter he faxed to plaintiffs.

(Compl. ¶ 26(b)). Paragraph 26(c)(i) states:

> On or about December 22, 1998, Arnold Cyr told Rose Louros in a telephone

conversation to Rose's residence that he had become part of the Global Trust Management Team and that all of plaintiffs' accounts and transactions would be through Global Trust Bank (not Levite Holdings). In said telephone conversation, he assured plaintiff that:

> at all times, the Investors['] principal was 100% guaranteed; plaintiff would have sole control over her account and would be able to withdraw principal at any time.

(*Id.* ¶ 26(c)(1)).

In any event, the Complaint alleges that the investment program was to begin in February 1999 and was to last three months. *See* Compl. ¶¶ 26(c)(ii); 26(e)(i)-(ii). Additionally, defendants' own correspondence to plaintiffs discusses an eight-week trading program. *See id.*, Exs. B, Q. Plaintiffs also allege that in order to participate in any investment program, plaintiffs were required to submit appropriate paperwork. *See id.*, Ex. Q. Thus, plaintiffs' participation in any investment program had to be evidenced in writing.

Defendants fail to show that any implied-in-fact contract (or oral contract for that matter) would be barred by the Statute of Frauds. Accordingly, defendants' motion to dismiss Counts Two and Three is denied.

## V. UNJUST ENRICHMENT (COUNT SIX)

■ Plaintiffs also bring in the alternative a claim for unjust enrichment stating that "defendants on behalf of the Global Trust Management Team took possession and/or control of plaintiffs['] funds" and "refuse[d] to return plaintiffs['] funds despite demand for their return." (Compl. ¶¶ 70, 71). Thus, plaintiffs allege, defendants have been unjustly enriched by

$341,000.[7] Defendants move to dismiss this claim arguing that since the breach of contract claims (Counts Two and Three) are barred by the Statute of Frauds, the unjust enrichment claim is also barred by the Statute of Frauds. Defendants rely on *Ellis v. Provident Life & Accident Insurance Co.*, 3 F.Supp.2d 399 (S.D.N.Y.1998) (Pollack, J.), *aff'd*, 172 F.3d 37, 1999 WL 55317 (2d Cir.1999), in which the Court held that any implied-in-fact contract found would be void for noncompliance with the Statute of Frauds. Defendants' reliance on *Ellis* is misplaced. *Ellis* involved a motion for summary judgment, while the case at bar concerns a motion to dismiss.

■ Defendants also argue that under New York law, "a claim of unjust enrichment based upon an uncontroverted oral contract, cannot stand." (Def. Reply ¶ E). In support of this argument, defendants cite *Huntington Dental & Medical Co., Inc. v. Minnesota Mining and Manufacturing Co.*, No. 95 civ. 10959, 1998 WL 60954 (S.D.N.Y. Feb.13, 1998), in which the court stated in dicta that "the law prevents a plaintiff from circumventing the reach of the statute of frauds by asserting a quasi-contract claim, such as quantum meruit or unjust enrichment." *Id.* at *7. *Huntington* involved an alleged oral distributorship agreement for the sale of goods. The court dismissed a breach of contract claim in part because the oral contract was barred by the Statute of Frauds as the contract was for an indefinite duration. The court then dismissed the claims for unjust enrichment and quantum meruit for failure to allege the elements of those causes of action.[8]

Defendants' reliance on *Huntington* is also without merit. First, it cannot be said at this point in the proceedings that the court is dealing with "an uncontroverted oral contract." As discussed above, plaintiffs have sufficiently alleged a written contract. Second, as held above, even assuming the parties had an oral or implied-in-fact contract, such contract is not subject to the Statute of Frauds as it could be performed within one year. Third, defendants do not argue that plaintiffs fail to plead the elements of unjust enrichment.[9]

Accordingly, defendants' motion to dismiss Count Six is denied.

7. An alternative theory of unjust enrichment is permitted where the existence or enforceability of a contract is in dispute. *Marcella v. ARP Films, Inc.*, 778 F.2d 112 (2d Cir.1985); *Newman & Schwartz v. Asplundh Tree Expert Co., Inc.*, 102 F.3d 660 (2d Cir.1996). Defendants do not argue that such an alternative theory of relief is not permitted.

8. To state a claim for unjust enrichment, a plaintiff must allege that "(1) defendant was enriched; (2) the enrichment was at plaintiff's expense; and (3) the circumstances were such that equity and good conscience requires defendants to make restitution." *Huntington Dental & Medical Co., Inc. v. Minnesota Mining and Manufacturing Co.*, No. 95 civ. 10959, 1998 WL 60954 (S.D.N.Y. Feb.13, 1998), citing *Violette v. Armonk Assoc., L.P.*, 872 F.Supp. 1279, 1282 (S.D.N.Y.1995).

9. Defendants' other citations are also inapposite. Defendants cite *Sater v. Wyckoff Heights Hospital*, 228 A.D,2d 427, 643 N.Y.S.2d 664 (N.Y.App.Div.1996), involving a motion for summary judgment, and *American–European Art Associates, Inc. v. Trend Galleries, Inc.*, 227 A.D.2d 170, 641 N.Y.S.2d 835 (N.Y.App. Div.1996), in which the court affirmed the lower court's ruling granting defendants' motion to dismiss a breach of contract claim. At issue in the latter case was the alleged oral agreement to sell a painting. The court held that the alleged oral contract was barred by New York's Uniform Commercial Code, which requires the sale of goods for more than $500 to be in writing and signed by the party against whom enforcement is sought.

## VI. CONVERSION (COUNTS FOUR AND FIVE)

Plaintiffs claim that defendants converted more than $340,000 of their money when they "took possession, custody and control" over the money and subsequently refused to return it. Defendants argue that plaintiffs' claims fail because the Complaint does not specify "which defendant received, has possession of the funds, or which of them has or had the power to return the funds." (Def. Reply ¶ D). This argument cannot be sustained.

Under New York law, "[c]onversion is any unauthorized exercise of dominion or control over property by one who is not the owner of the property which interferes with and is in defiance of a superior possessory right of another in the property." *Meese v. Miller*, 79 A.D.2d 237, 436 N.Y.S.2d 496, 500 (N.Y.App.Div. 1981); *Van Syckle v. C.L. King and Assocs., Inc.*, 822 F.Supp. 98, 106 (N.D.N.Y. 1993) (finding that "party who wrongfully sells stock of another may be found guilty of conversion"). To maintain a viable claim for conversion, plaintiffs must allege that "a demand for the return of property was made and that a refusal to comply with this demand followed." *Schloss v. Danka Business Systems PLC*, No. 99 Civ. 0817, 2000 WL 282791, *7 (S.D.N.Y. March 16, 2000) (citing *Tompkins v. Fonda Glove Lining Co.*, 188 N.Y. 261, 80 N.E. 933 (N.Y.1907)); *aff'd*, 2000 WL 1715262 (2d Cir. Nov.13, 2000); *Granat v. Center Art Galleries–Hawaii, Inc.*, No. 91 Civ. 7252, 1993 WL 403977, *7 (S.D.N.Y. Oct. 6, 1993) (finding that defendants' alleged refusal to return painting satisfies grounds for conversion claim).

Plaintiffs adequately plead claims of conversion. Plaintiffs allege that all the named defendants worked together as The Global Trust Management Team and that defendants worked in concert to effect the banking scheme. It is undisputed that in accordance with instructions by Wilkinson, Cyr and Johnson, plaintiffs wired over $340,000 to Liechtenstein and executed powers of attorney appointing Sexton attorney-in-fact for the sole purpose of establishing individual bank accounts for plaintiffs in the newly-formed Liechtenstein bank. Defendants' receipt and possession of plaintiffs' money is evidenced by the account statements prepared by Wilkinson and Adler and sent to plaintiffs by Adler. Additionally, The Global Trust Management Team sent a letter to plaintiffs dated March 22, 1999 stating that there would soon be a return of all funds. Finally, plaintiffs allege that they demanded return of the money and that defendants refused. (Comp.¶¶ 62, 67).

Plaintiffs state a cause of action for conversion. Accordingly, defendants' motion to dismiss Counts Four and Five is denied.

## VII. BREACH OF FIDUCIARY DUTY (COUNT SEVEN)

Plaintiffs allege that a fiduciary relationship existed between plaintiffs and the Global Trust Management Team and that defendants breached their fiduciary duty. In support, plaintiffs claim that they executed powers of attorney appointing Sexton attorney-in-fact "pursuant to instructions of Arnold Cyr, Douglas Johnson, Ken Adler and Kevin McGeever, which powers of attorney were forwarded by defendant Wilkinson to either Arnold Cyr and/or Adler for plaintiffs to sign." (*Id.* ¶ 74(a)). Plaintiffs also assert that the relationship between the parties was that of "a depositor and Private Investment Bank." (*Id.* ¶ 74(b)). For the reasons stated below, this claim is dismissed.

Plaintiffs claim that their grant of a power of attorney to Sexton created a fiduciary relationship between plaintiffs

and defendants. This claim cannot be sustained. First, James Sexton has never been served or has never appeared in this action. Second, even if Sexton was a party to this action, the limited grant of the power of attorney by plaintiffs did not necessarily give rise to a fiduciary relationship. "In general, a written power of attorney is a formal contract and creates a principal/agent relationship. However, an agency relationship only exists if the agent acts primarily for the benefit of the principal and not for himself." *Northwestern National Insurance Company of Milwaukee, Wisconsin v. Alberts*, 769 F.Supp. 498, 508 (S.D.N.Y.1991), citing Restatement of Agency (2d) § 14(d) (1988). Here, Sexton required all depositors to execute a power of attorney designating him attorney-in-fact for the sole purpose of establishing the individual bank accounts. However, Sexton was not acting as a mere agent of plaintiffs. Rather, he played a primary role in the development of the entire private banking scheme and received a $25,000 fee from Johnson and McGeever for his services. "The purpose of [plaintiffs'] grant of power of attorney to [Sexton] was merely to facilitate the transaction." *Id.* Therefore, there is no fiduciary relationship between plaintiffs and Sexton. In addition, the power of attorney to Sexton did not create a fiduciary duty in the other defendants. Thus, the power of attorney naming Sexton did not create a fiduciary relationship between the plaintiffs and defendants.

Plaintiffs also describe their relationship with defendants as one between a debtor and an investment bank. Under New York law, "the underlying relationship between a bank and its depositor is the contractual one of debtor and creditor." *Merrill Lynch, Pierce, Fenner & Smith v. Chemical Bank*, 57 N.Y.2d 439, 444, 456 N.Y.S.2d 742, 442 N.E.2d 1253 (N.Y.1982); *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, National Assoc.*, 731 F.2d 112, 122 (2d Cir.1984) ("New York law is clear that the usual relationship of bank and customer is that of a debtor and creditor."). As such, a bank does not owe a fiduciary duty to its customers. *In re Gas Reclamation, Inc. Securities Litigation*, 741 F.Supp. 1094, 1104; *Aaron Ferer & Sons*, 731 F.2d at 122.

Plaintiffs have not alleged any facts to support their claim that a fiduciary relationship existed between plaintiffs and defendants. Accordingly, Count Seven is dismissed.

## VII. NEGLIGENCE (COUNT NINE)

Plaintiffs claim that defendants "undertook to perform and/or agreed to perform certain banking and investment services" and were careless, reckless and negligent in the performance of the banking services and investment services." (Compl.¶¶ 85, 87). Despite plaintiffs' conclusory statement that "defendants had a duty to perform [the banking] services with due care," the Complaint does not allege that defendants had any duty to plaintiffs outside the contractual debtor-creditor relationship. Accordingly, Count Nine is dismissed.

## VIII. VIOLATIONS OF NEW YORK BANKING AND GENERAL BUSINESS LAWS (COUNT EIGHT)

Plaintiffs allege that defendants violated New York State General Business Law § 349 and New York State Banking Law §§ 131, 132 and 180 by soliciting and receiving deposits from plaintiffs, performing banking services and using the words "bank," "banking" and "trust" in their written materials. (Compl.¶¶ 79–83). Defendants argue that plaintiffs lack standing to bring this claim. Neither party ade-

quately briefed its arguments, but rather each made conclusory statements to support its position. For the following reasons, plaintiffs' claim is dismissed.

■■■■ New York General Business Law § 349 states in relevant part that

[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful.

N.Y. Gen. Bus. Law § 349(a). In addition, § 349(h) provides a private right of action enabling

any person who has been injured by reason of any violation of this section [to] bring an action in his own name to enjoin such unlawful act or practice.

N.Y. Gen. Bus. Law § 349(h). However, § 349(h) is not a general provision permitting an individual to bring any action involving a business dispute. Rather, § 349 is part of the New York Consumer Protection Act and as such "was designed to govern only those marketplace abuses which affect the public interest or also cause injury to the public." *O'Connor v. Reader's Digest Association, Inc.*, No. 92 Civ. 7414, 1993 WL 291372, *3 (S.D.N.Y. 1993). "Indeed, the gravamen of the complaint must be consumer injury or harm to the public interest." *Sports Traveler v. Advance Magazine Publishers, Inc.*, No. 96 Civ. 5150, 1997 WL 137443, *2 (S.D.N.Y.1997) (internal quotation marks

and citation omitted). Further, "federal courts have interpreted the statute's scope as limited to the types of offenses to the public interest that would trigger Federal Trade Commission intervention ... such as potential danger to the public health or safety." *Id.*

As a threshold matter, plaintiffs fail to address the issue of whether defendants' alleged deceptive acts and practices even meet the definition of conducting business, trade or commerce or furnishing a service in New York State. As alleged, defendants solicited plaintiffs in New York; however the bank was to be established in Liechtenstein, and the actions complained of allegedly occurred in Liechtenstein and in states other than New York. Additionally, the Global Trust Limited letterhead has either "Vaduz, Liechtenstein" or a Georgia fax number printed on it, *see e.g.*, Compl., Exs. E, F, and Cyr worked from Clermont, Florida, *see id.*, Exs. G, J.

■■■ In any event, plaintiffs fail to plead the public interest requirement of § 349. The Complaint alleges damages to plaintiffs personally. Additionally, the alleged actions come nowhere within the scope of potential danger to the public health or safety.

■■■ Plaintiffs also make the conclusory allegation that defendants violated New York Banking Law §§ 131, 132 and 180.[10]

---

**10.** Section 131 of the Banking Law provides in relevant part that

[n]o corporation, domestic or foreign, other than a national bank or a federal reserve bank ... shall employ any part of its property, or be in any way interested in any fund which shall be employed for the purpose of receiving deposits, making discounts, receiving for transmission or transmitting money in any manner whatsoever....

N.Y. Banking Law § 131(1). Any person violating this section "shall forfeit one thousand

dollars to the people of the state." N.Y. Banking Law § 131(5).

Section 132 of the Banking Law states that

[n]o person, except a national bank, a federal reserve bank, or a corporation duly authorized by the superintendent to transact business in this state, shall make use of ... or circulate any letterheads ... or any written or printed or partly written and partly printed paper whatsoever, having thereon any artificial or corporate name, or other word or words, indicating that such busi-

Plaintiffs do not respond to defendants' argument that they lack standing to bring an action under §§ 131, 132 and 180 but rather argue that § 349(g) [11] "provide[s] that . . . a deceptive practices claim would include, but not be limited to, defendants['] breach of laws, such as" §§ 131, 132 and 180. (Pl. Mem. at 12). Plaintiffs' misapprehend § 349(g). Section 349(g) merely states that the scope of deceptive acts or practices is not restricted to those acts subject to other legal prohibitions. At the same time, § 349 does not limit or affect the authority of the attorney general to enforce other laws. Section 349 does not provide a private right of action for individuals to enforce any New York State law and plaintiffs do not cite (and could not cite) any authority holding that § 349 provides a private right of action to enforce any New York State law regardless of a plaintiff's standing under that particular law.

▇▇▇ In any event, even if § 349 gave plaintiffs standing to bring an action pursuant to §§ 131, 132 and 180, as discussed above, plaintiffs fail to demonstrate that defendants were conducting banking business in New York State and fail to plead how violations of the banking sections meet the public interest requirement of § 349. Accordingly, Count Eight is dismissed.

## IX. PERSONAL JURISDICTION OVER DEFENDANT WILKINSON

### A. Standard Applicable to Motion to Dismiss

▇▇▇ Plaintiffs bear the ultimate burden of establishing that the court has jurisdiction over a defendant. *Kernan v. Kurz–Hastings, Inc.*, 175 F.3d 236, 240 (2d Cir.1999); *Metropolitan Life Ins. Co. v. Robertson –Ceco Corp.*, 84 F.3d 560, 566 (2d Cir.1996). The burden of proof plaintiffs must meet varies with the procedural posture of the case. Prior to discovery, plaintiffs need only make a prima facie showing through the pleadings and affidavits that jurisdiction exists. *Id.*, citing *Ball v. Metallurgie Hoboken–Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir.1990). In determining whether the plaintiffs have met this burden on a Rule 12(b)(2) motion, the court must assume that all of the plaintiffs' factual allegations are true, and all "doubts are resolved in the plaintiffs' favor, notwithstanding a controverting presentation by the moving party." *A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79–80 (2d Cir.1993). Ultimately, however, the plaintiffs must establish personal jurisdiction by a preponderance of the evidence, either at an evidentiary hearing or at trial. *Id.* at 79.

ness is a business of a bank or trust company. . . .
N.Y. Banking Law § 132.
Section 180 of the Banking Law provides in relevant part that

[e]xcept as authorized by this chapter, no individual . . . and no partnership or unincorporated association shall [e]ngage in the business of receiving deposits [or][m]ake use of the words "bank," "banker," or "banking" or any derivative or compound of any such words . . . in any . . . letterhead or in other written or printed matter, in such a manner as might indicate that such individual, partnership or unincorporated

association is authorized to engage in business as a bank or private bank.
N.Y. Banking Law §§ 180(1), (2). Any person who violates this section will be guilty of a misdemeanor. N.Y. Banking Law § 180.

11. Section 349(g) provides:

This section shall apply to all deceptive acts or practices declared to be unlawful, whether or not subject to any other law of this state, and shall not supersede, amend or repeal any other law of this state under which the attorney general is authorized to take any action or conduct any inquiry.

## B. Personal Jurisdiction

Personal jurisdiction in a diversity case is determined first by the law of the state in which the district court sits. *Kernan,* 175 F.3d at 240; *Arrowsmith v. U.P.I.,* 320 F.2d 219, 223 (2d Cir.1963). Then if jurisdiction is found under state law, the court must examine whether exercise of that jurisdiction "comports with the requisites of due process." *Bensusan Restaurant Corp. v. King,* 126 F.3d 25, 27 (2d Cir.1997).

### 1. New York's Jurisdictional Statute

Plaintiffs seek to ground jurisdiction upon § 302(a)(2) of New York's long-arm statute, which states in relevant part:

As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent:

2. commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act. . . .

N.Y. C.P.L.R. 302(a)(2).[12]

It is undisputed that defendant Wilkinson was never present in New York to promote, manage or administer the Liechtenstein banking scheme. However, plaintiffs argue that Wilkinson performed purposeful conduct in New York by faxing letters or documents to New York. (Pl. Mem. at 14). The Complaint only mentions some minor direct contacts that Wilkinson had with the plaintiffs in New York. For example, Wilkinson faxed a letter to plaintiffs in New York on March 14, 1999. (Compl. ¶ 17; *id.,* Ex. Q). The letter informed plaintiffs that the original invest-

ment program had "changed dramatically" but that the Global Trust Management Team had located a new program, "which we believe will meet the goals and objectives of all Participants." Additionally, plaintiffs state that Wilkinson "prepared, managed and/or supervised the preparation of depositor account statements, including plaintiff's [sic], which were sent to plaintiffs in New York." (*Id.* ¶ 21(q)). While these allegations are evidence of Wilkinson's participation in the banking scheme, they alone are insufficient to confer jurisdiction over him pursuant to § 302(a)(2). "[F]ederal cases construing § 302(a)(2), including a 1986 decision by the Second Circuit, have uniformly held that jurisdiction under [this] section cannot be predicated on telephone calls made or letters mailed into this State." *Stein v. Annenberg Research Institute,* No. 90 Civ. 5224, 1991 WL 143400, at *3 (S.D.N.Y. July 19, 1991), citing *Fox v. Boucher,* 794 F.2d 34 (2d Cir.1986).

Plaintiffs argue that jurisdiction over Wilkinson can be exercised pursuant to an agency theory of personal jurisdiction or by the act of a co-conspirator. Under New York law, a court "may exercise jurisdiction over a defendant who acted through an agent even if that defendant never physically entered New York." *In re Sumitomo Copper Litigation,* 120 F.Supp.2d 328, 336 (S.D.N.Y.2000) (Pollack, J.) A formal agency relationship is not required to establish that an out-of-state defendant acted through his agent. *Id.*

Plaintiffs need 'only convince the court that [the agent] engaged in purposeful activities in this State in relation to [plaintiffs'] transaction for the benefit of and with the knowledge and consent of

---

**12.** Plaintiffs do not argue that jurisdiction can be predicated on § 302(a)(1) or (3). Nevertheless, it does not appear from the Complaint that plaintiffs could meet the standards of these sections of the long arm statute.

the [ ] defendants and that they exercise[d] some control over [the agent] in the matter.'

*Id.,* quoting *Karabu Corp. v. Gitner,* 16 F.Supp.2d 319, 323 (S.D.N.Y.1998), in turn quoting *Kreutter v. McFadden Oil Corp.,* 71 N.Y.2d 460, 467, 527 N.Y.S.2d 195, 522 N.E.2d 40 (N.Y.1988) (changes in original).

 Plaintiffs meet this standard. First, it is undisputed that defendants Arnold Cyr and Ken Adler engaged in purposeful activities in New York with respect to the Liechtenstein banking scheme. For example, after Cyr and Adler solicited plaintiffs' participation, resulting in wire transfers to Liechtenstein of over $340,000, on or about February 17, 1999, Cyr and Adler met with Rose Louros in New York to discuss high yield investment programs. Second, there is no question that Wilkinson knew, approved of and benefitted from these activities. Wilkinson initiated the establishment of the bank in Liechtenstein; was a member of the Global Trust Management Team, which solicited depositors; prepared the individual account balances; and was to benefit financially from the structure. *See e.g.,* Compl., Ex. C. Third, Wilkinson exercised some control over the other defendants. For example, Wilkinson initiated contact with Johnson and McGeever and introduced them to Sexton; Wilkinson acted as the conduit of information between defendants in the United States and Sexton in Liechtenstein; Wilkinson directed defendants to obtain powers of attorney and bank references from the prospective depositors; and gave the other defendants the wiring instructions depositors were to use.

Thus, to determine jurisdiction over Wilkinson, the court will consider the actions of the other defendants as agents of Wilkinson. Under § 302(a)(2), if the defendants, as agents of Wilkinson, committed a tortious act in New York, the court will have jurisdiction over Wilkinson. As discussed above, plaintiffs have alleged claims for fraud, conversion and unjust enrichment. Defendants Arnold Cyr, Lynn Cyr and Ken Adler do not contest that they had purposeful activity in New York sufficient to confer this court's jurisdiction over them. Accordingly, the court may exercise personal jurisdiction over Wilkinson based on the in-state tortious activities of his agents.

 Plaintiffs also argue that personal jurisdiction over Wilkinson may be found if one of his co-conspirators committed a tort in New York. "It is well established that acts committed in New York by the co-conspirator of an out-of-state defendant pursuant to a conspiracy may subject the out-of-state defendant to jurisdiction under C.P.L.R. 302(a)(2)." *Chrysler Capital Corp. v. Century Power Corp.,* 778 F.Supp. 1260, 1266 (S.D.N.Y.1991); *In re Sumitomo Copper Litigation,* 120 F.Supp.2d at 338, citing *Grove Press, Inc. v. Angleton,* 649 F.2d 121, 123 (2d Cir. 1981). Plaintiffs must 1) make a prima facie factual showing of a conspiracy, 2) allege specific facts to infer that Wilkinson was a member of the conspiracy, and 3) show that defendant's co-conspirator committed a tortious act in New York. *In re Sumitomo Copper Litigation,* 120 F.Supp.2d at 339.

> To make a prima facie factual showing of a conspiracy, 'a plaintiff must allege the primary tort and four elements: (a) a corrupt agreement between two or more persons, (b) an overt act in furtherance of the agreement, (c) the parties' intentional participation in the furtherance of a plan or purpose, and (d) the resulting damage or injury.'

*Id.,* quoting *Chrysler Capital Corp.,* 778 F.Supp. at 1267.

Plaintiffs meet the first prong of the test by making a prima facie showing of conspiracy. As discussed in detail above, plaintiffs allege that defendants committed fraud by soliciting over $340,000 from plaintiffs with the promise that the funds would be deposited in individual accounts in a new bank in Liechtenstein; that plaintiffs would receive tax-free interest; that the money would be guaranteed dollar for dollar; that plaintiffs would have sole control and authority over the accounts; that plaintiffs would be eligible to participate in a high yield investment program; and that the money would not be moved or transferred without the express written consent of the plaintiffs. As alleged, defendants did not establish individual bank accounts, but rather deposited all the money into one account for the purpose of aggregating at least $10 million. Thereafter, despite plaintiffs' demand, defendants did not return the funds.

Plaintiffs also sufficiently allege a corrupt agreement among the defendants to solicit participation in the Liechtenstein bank scheme. The signed statement by Johnson and McGeever clearly evidences an explicit agreement to form the bank, solicit depositors, and aggregate at least $10 million to place into a high interest program. However, plaintiffs were not told defendants' goal in soliciting money. Rather, defendants Cyr and Adler sent literature to plaintiffs describing the benefits of personalized, private banking, including individual, secure accounts and guaranteeing their deposits dollar for dollar.

Plaintiffs also sufficiently plead overt acts done in furtherance of the agreement and in an effort to have plaintiffs wire money to Liechtenstein, including requiring plaintiffs to furnish bank references, passport information and powers of attorney, meeting with Rose Louros in New York in February 1999, and initiating numerous telephone and fax communications with plaintiffs.

The defendants' intentional participation in furtherance of the banking scheme is also evident from their communications with plaintiffs. The signed statement by Johnson and McGeever also describes in detail the different roles members of the Global Trust Management Team played to solicit and aggregate at least $10 million.

Plaintiffs also allege, among other things, that they were injured by the loss of $341,000 due to defendants' actions. While defendants promised that all deposits would be safe and guaranteed dollar for dollar, and that plaintiffs' funds would be returned, defendants did not return the money.

Plaintiffs meet the second prong of the test for co-conspirator jurisdiction by alleging specific facts to infer that Wilkinson was a member of the conspiracy. Wilkinson approached Johnson and McGeever about setting up a bank in Liechtenstein; Wilkinson knew a contact, Sexton, with the necessary government connections and put Johnson and McGeever in touch with Sexton; Wilkinson acted as the conduit of information and prepared the account balance statements; Wilkinson hired the initial auditors; and subsequently, Wilkinson refused to have communication with Johnson and McGeever and instructed them to speak to his attorney. These facts sufficiently permit the inference that Wilkinson was a part of the conspiracy.

Finally, plaintiffs plead that Wilkinson's co-conspirators committed a tortious act in New York. As discussed above, plaintiffs sufficiently claim that defendants committed fraud, among other things, and committed acts in New York to perpetuate that fraud.

Accordingly, the court has personal jurisdiction over Wilkinson pursuant to the co-conspirator theory of jurisdiction.

### 2. Due Process

■ Before a court may exercise personal jurisdiction it must satisfy an additional requirement and ensure that invoking jurisdiction "comports with the requisites of due process." *Bensusan*, 126 F.3d at 27. In this regard, the defendant's activities in New York must constitute " 'some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum States, thus invoking the benefits and the protection of its laws.' " *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (citations omitted). The exercise of jurisdiction must not offend "our traditional conception of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 320, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Exercise of jurisdiction comports with the requirements of due process only if "minimum contacts exist between the defendant and the forum state." *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). Requiring minimum contacts serves two goals: fairness and federalism. *Id.* Requiring fairness protects defendants from the burdens of litigating in a distant forum, while federalism "ensure[s] that the States through their courts, do not reach out beyond the limits imposed on them by their status as coequals in the sovereign system." *Id.* at 292, 100 S.Ct. 559.

■ Although Wilkinson resides and does business in Georgia, his role as a primary actor in the banking scheme and the subsequent actions by Wilkinson and his co-conspirators are sufficient to satisfy the requirements of due process. In addition, it is reasonable for Wilkinson to expect to be hailed into court in this forum to defend his actions as those actions were part of a plan that was designed to and succeeded in soliciting New Yorkers to part with hundreds of thousands of dollars to their detriment.

Accordingly, the court may exercise personal jurisdiction over defendant Wilkinson.[13]

### *CONCLUSION*

For the reasons set forth above, defendants' motion to dismiss the Complaint is granted as to Claims Seven, Eight, Nine and Ten, and denied as to Claims One, Two, Three, Four, Five and Six.

SO ORDERED.

---

**13.** Although Wilkinson states that he moves to dismiss the Complaint for improper venue, he does not argue this point in his memorandum in support of his motion. Therefore, I do not address this issue.