**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 09-1825**

─────────────

TRADEMARK PROPERTIES INCORPORATED, a South Carolina
Corporation; RICHARD C. DAVIS, an Individual,

        Plaintiffs - Appellees,

      v.

A&E TELEVISION NETWORKS, a Joint Venture of the Hearst
Corporation; DEPARTURE FILMS, an Entity of Unknown Origin,

        Defendants – Appellants,

      and

ABC, INCORPORATED; NBC UNIVERSAL; DOES 1-20, Inclusive,

        Defendants.

─────────────

Appeal from the United States District Court for the District of
South Carolina, at Charleston.  C. Weston Houck, Senior District
Judge.  (2:06-cv-02195-CWH)

─────────────

Argued:  October 27, 2010        Decided:  April 11, 2011

─────────────

Before KING and DUNCAN, Circuit Judges, and Bobby R. BALDOCK,
Senior Circuit Judge of the United States Court of Appeals for
the Tenth Circuit, sitting by designation.

─────────────

Affirmed by unpublished opinion.  Senior Judge Baldock wrote the
majority opinion, in which Judge King joined.  Judge Duncan
wrote a separate opinion dissenting from the judgment.

─────────────

**ARGUED:** Michael B. Mukasey, DEBEVOISE & PLIMPTON LLP, New York, New York, for Appellants. William Walter Wilkins, NEXSEN PRUET, Greenville, South Carolina, for Appellees. **ON BRIEF:** Jeremy Feigelson, S. Zev Parnass, DEBEVOISE & PLIMPTON LLP, New York, New York; Richard Ashby Farrier, Jr., Robert H. Jordan, NELSON MULLINS RILEY & SCARBOROUGH LLP, Charleston, South Carolina, for Appellants. Kirsten E. Small, NEXSEN PRUET, Greenville, South Carolina, for Appellees.

---

Unpublished opinions are not binding precedent in this circuit.

BALDOCK, Senior Circuit Judge:

Plaintiff Richard C. Davis approached Defendant A&E Television Networks with the concept that he maintains became the reality television series "Flip This House."[1] This dispute arises out of the parties' disagreement over an alleged oral agreement to split equally net revenues of the show. Plaintiff sued Defendant in state court for breach of that oral contract in 2006, demanding approximately $7.5 million in damages, *i.e.*, half of the net revenues from the three seasons that had completed filming prior to trial.[2] Defendant successfully removed the case to federal court on the basis of diversity jurisdiction. After five days of trial in South Carolina federal district court, a jury returned a verdict awarding Plaintiff a little over $4 million, essentially half of the first season's net revenues. The district court subsequently denied Defendant's motions for judgment as a matter of law and a new trial pursuant to Fed. R. Civ. P. 50(b) and Fed. R. Civ. P. 59, respectively. Defendant argues we should reverse and direct judgment in its favor because the evidence was legally

---

[1] Plaintiff Davis incorporated Plaintiff Trademark Properties, Inc. as part of his real estate business. While both are Plaintiffs in this suit, for simplicity's sake we refer to Davis as Plaintiff.

[2] The parties refer to "net profits" and "net revenues" interchangeably. As a result, so do we.

3

insufficient to support a finding of an oral contract under New York law or, alternatively, order a new trial because of claimed errors in jury instructions and evidentiary rulings. We exercise our appellate jurisdiction provided by 28 U.S.C. § 1291. After careful review of the record submitted on appeal, we affirm the district court's denial of Defendant's motions for judgment as a matter of law and a new trial.

## I.

We review the district court's denial of Defendant's Rule 50(b) motion for a judgment as a matter of law de novo. Sloas v. CSX Transp. Inc., 616 F.3d 380, 392 (4th Cir. 2010). In conducting that review, we ask "'whether there was a legally sufficient evidentiary basis for a reasonable jury, viewing the evidence in the light most favorable to the prevailing party, to find for that party. If reasonable minds could differ about the verdict, we are obliged to affirm.'" King v. McMillan, 594 F.3d 301, 312 (4th Cir. 2010) (quoting ABT Bldg. Prods. Corp. v. Nat'l Union Fire Ins. Co., 472 F.3d 99, 113 (4th Cir. 2006)) (internal citations omitted); see also Fed. R. Civ. P. 50(a)(1) (providing a court may grant a party judgment as a matter of law if "a reasonable jury would not have a legally sufficient evidentiary basis to find for" the nonmoving party). We review the entire record, "disregard[ing] all evidence favorable to the

4

moving party that the jury is not required to believe." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151 (2000).

## II.

Given that standard of review, we have gleaned and so present the following facts necessary to explain our holding. Plaintiff is a South Carolina real estate broker who buys underpriced properties to renovate and sell, engaging in a process we are told is commonly known as "flipping." In 2003, Plaintiff conceived of the idea of a television show to document the flipping process and later developed a pilot episode of the show. In 2004, Plaintiff submitted the pilot to multiple television networks, including Defendant. Defendant's vice president directed him to deal with Charles Nordlander, director of lifestyle programming for Defendant.

After Nordlander viewed the pilot, the two spoke over the phone for a little less than an hour on June 3, 2004 about turning the show into a series. Essentially, Plaintiff proposed that he would assume all of the financial risk relating to the purchase and resale of the real estate but that they would otherwise equally split the net revenues of the television show. In response to Plaintiff's offer, Plaintiff maintains Nordlander said "Okay, okay, I get it." Thus, Plaintiff argues that by the end of this June 3 telephone conversation he and Defendant, via

5

Nordlander, had entered into an oral contract to produce a television series based on Plaintiff's pilot and to share all resulting net revenues equally, subject to approval by Defendant's board of directors.

Plaintiff testified that Nordlander arranged a conference call shortly thereafter during which Plaintiff confirmed the terms of the contract with three other representatives of Defendant. Nordlander also arranged a meeting in New York on June 14 between a production company, Departure Films, and Plaintiff. With Departure Films on board, filming for the pilot began in August 2004. In March 2005, Defendant's Senior Vice President e-mailed Plaintiff that "[t]he board approved the money for our series." Plaintiff and Departure Films then began filming season one.

The parties never reduced any oral agreement to writing. Nonetheless, they filmed thirteen episodes of "Flip this House." By all accounts, the show was a commercial success. But, as must be the case since the parties came knocking on the Court's door, their business relationship fell apart in 2006. The parties could not resolve the matter of Plaintiff's compensation. Defendant offered to pay Plaintiff an appearance fee per episode and a five percent share of incremental revenue attributable to the show. Plaintiff rejected that offer and signed a talent agreement with another television network.

6

Defendant went on to produce three more seasons of "Flip this House" without Plaintiff's participation. Defendant never paid Plaintiff any money, let alone half of the series' net revenue, for his role in its production. At trial, Defendant denied ever entering into any contract with Plaintiff.

## III.

We start by setting forth the principles of contract law relevant to Defendant's claim that it is entitled to judgment as a matter of law. "[B]ecause the matter is before us in diversity, we are bound by the applicable state substantive law." Benner v. Nationwide Mut. Ins. Co., 93 F.3d 1228, 1234 (4th Cir. 1996). And, because neither party contests the district court's ruling that New York law controls, we apply the laws of New York.

Absent prohibition by the statute of frauds, oral contracts are just as binding as written contracts under New York law.[3] Stein v. Gelfand, 476 F. Supp. 2d 427, 431 (S.D.N.Y. 2007). To establish Defendant breached their oral contract, Plaintiff must, of course, first prove that they formed such a contract. Cleveland Wrecking Co. v. Hercules Constr. Corp., 23 F. Supp. 2d

---

[3] Defendant does not raise the statute of frauds as a defense on appeal.

7

287, 292 (E.D.N.Y. 1998). "'To form a valid contract under New York law, there must be an offer, acceptance, consideration, mutual assent and intent to be bound.'" Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 427 (2d Cir. 2004) (quoting Louros v. Cyr, 175 F. Supp. 2d 497, 512 n.5 (S.D.N.Y. 2001)). "'[M]utual assent is essential to the formation of a contract and a party cannot be held to have contracted if there was no assent or acceptance.'" Id. (quoting Maffea v. Ippolito, 668 N.Y.S.2d 653, 654 (N.Y. App. Div. 1998)). "There must, in other words, be 'an objective meeting of the minds sufficient to give rise to a binding and enforceable contract.'" Int'l Bus. Mach. Corp. v. Johnson, 629 F. Supp. 2d 321, 330 (S.D.N.Y. 2009) (quoting Tractelbel Energy Mktg., Inc. v. AEP Power Mktg., Inc., 487 F.3d 89, 95 (2d Cir. 2007)), aff'd, 355 F. App'x 454 (2d Cir. 2009). The same is true whether the parties formed the contract orally or with the written word. However, where an alleged contract is oral, the party asserting its enforceability bears an even heavier burden of proving more than agreement on or acceptance of all material terms, but also overall agreement to be bound by the oral agreement without a writing. When the alleged contract is oral, "[m]ore is needed than agreement on each detail [to create a binding obligation. There must be] overall agreement . . . to enter into the binding contract." N.F.L. Ins. Ltd. by Lines v. B&B Holdings, Inc., 874 F. Supp. 606, 613

8

(S.D.N.Y. 1995) (addition in original) (internal quotations and citations omitted)); see also Shaftel v. Dadras, 39 F. Supp. 2d 217, 226 (E.D.N.Y. 1999) (detailing the four-factor test New York law employs to discern whether parties intended to be bound by their oral agreement without a writing), aff'd 78 F. App'x 169 (2d Cir. 2003).[4]

"Generally, courts look to the basic elements of the offer and the acceptance to determine whether there is an objective meeting of the minds sufficient to give rise to a binding and

_____

[4] Defendant makes much of the following text from an unpublished decision, suggesting it represents a unique and stringent standard for proving the existence of oral contracts under New York law: "But, despite any multi-factor inquiry [as to whether the parties intended to be bound without a writing], if the Court finds substantial ambiguity regarding whether both parties have mutually assented to all material terms, then the Court can neither find, nor enforce, a contract." Barbarian Rugby Wear, Inc. v. PRL USA Holdings, Inc., No. 06 Civ. 2652(JGK), 2008 WL 5169495, at *3 (S.D.N.Y. Dec. 9, 2008). The citations Barbarian provides for support of that statement, however, make clear that the statement is simply another way of saying the following basic precepts of oral and written contract law: "If an agreement is not reasonably certain in its material terms, there can be no legally enforceable contract," Missigman v. USI Ne., Inc., 131 F. Supp. 2d 495, 506 (S.D.N.Y. 2001), and "To create a binding contract, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms," Express Indus. & Terminal Corp. v. Dep't of Transp., 715 N.E.2d 1050, 1053 (N.Y. 1999). We discuss the definiteness of Defendant's acceptance and the agreement's material terms, infra. But because we need not consider the definiteness of the agreement's material terms if we determine Defendant did not manifest acceptance at all (which is hotly disputed), we begin by evaluating whether Nordlander expressed acceptance to Plaintiff's offer.

9

enforceable contract." Express Indus., 715 N.E.2d at 1053. "The first step" in that analysis requires a court "to determine whether there is a sufficiently definite offer such that its unequivocal acceptance will give rise to an enforceable contract." Id. But, even assuming Plaintiff's offer was sufficiently definite, Defendant maintains Plaintiff's assertion of its acceptance of his offer was not. We therefore move to the next step in the mutual assent analysis: acceptance.

As long as the offer does not dictate otherwise, "oral acceptance of an offer is valid." 22 N.Y. Jur. 2d Contracts § 45. Parties may also manifest the "'assent necessary to form a contract . . . by . . . act, or conduct which *evinces the intention of the parties to contract*.'" Register.com, 356 F.3d at 427 (quoting Maffea, 668 N.Y.S.2d at 654)). Plaintiff accordingly asked the district court to instruct the jury that "a contract is an obligation which arises from actual agreement of the parties, manifested by words, oral or written, or by conduct." Supp. J.A. at 2. The district court, however, refused to give that instruction, concluding the trial had revealed no "conduct . . . that could be interpreted as constituting an acceptance by the [D]efendant of any offer made by [Plaintiff] so as to make a contract." Id. at 4. Instead, the court instructed the jury that "[a] contract is an obligation which arises from actual agreement of the parties,

manifested by words, oral or written." J.A. at 559—60. On appeal, Plaintiff neither challenges the district court's ruling and subsequent instruction nor contends that Defendant accepted his offer by conduct. To the contrary, Plaintiff contends "Nor[d]lander agreed to the terms [of his offer], saying, 'Okay, okay, I get it.'" Aple. Resp. Br. at 6 (quoting J.A. at 258); see also id. at 19 ("[Plaintiff] specifically testified that Nor[d]lander agreed to the terms, saying, 'Okay, okay, I get it.'").[5] Because Plaintiff has evidently abandoned his claim that Defendant accepted his offer by virtue of its conduct, we must decide only whether a reasonable jury could conclude from the trial evidence that Defendant accepted Plaintiff's offer through

---

[5] Plaintiff does not fail to mention the parties' conduct altogether. In his brief, Plaintiff argues "[t]he parties' nearly complete performance of their respective obligations under the contract . . . is likewise 'of major significance.'" Aple. Resp. Br. at 28 (quoting R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 75 (2d Cir. 1984)). But he contends that the parties' performance is of "'major significance'" to "the determination of whether the parties intended to be bound in the absence of a written agreement[,]" not to the determination of whether the parties had reached an oral agreement in the first place, *i.e.*, whether Nordlander or Defendant accepted Plaintiff's offer. Aple. Resp. Br. at 27 (citing R.G. Group, 751 F.2d at 75—76 (detailing four factors New York courts use to decide whether "the parties' words and deeds, within a given bargaining context, show an intent to be bound only by a written agreement.")). Plaintiff must first clear the hurdle of demonstrating Defendant assented to his offer in order to reach the issue of whether the parties' intended to be bound by their oral agreement without a written document.

11

oral or written words. See King, 594 F.3d at 312 (explaining the standard of review of a district court's denial of a Rule 50 motion).

Generally, "in order for an acceptance to be effective, it must comply with the terms of the offer and be clear, unambiguous and unequivocal." King v. King, 617 N.Y.S.2d 593, 594 (N.Y. App. Div. 1994); see also 2 Williston on Contracts § 6:10 (4th ed. 2007) ("As a general principle, at common law an acceptance, in order to be effective, must be positive and unambiguous."). When an offeree communicates "an acceptance [that] is ambiguous or equivocal—that is, an acceptance that a reasonable person could view as assent, rejection, or an invitation to bargain further . . . it is the offeror's reaction to that ambiguous acceptance that controls whether the parties have entered into a contract." Johnson, 629 F. Supp. 2d at 330.

> [B]y their nature, equivocal responses are capable of being understood either as the offeree apparently intends them . . . or as the offeror might apparently understand them. . . . To the extent that either interpretation is plausible, the offeree can hardly complain if the offeror understands the communication as the offeree apparently intended; and the offeror who reasonably treats an equivocal response as an acceptance may hold the offeree to a contract. This rule . . . operates to protect the offeror who acts reasonably in relation to what it supposes is intended to operate as an acceptance, yet provides the offeror with significant flexibility as the master of the offer. *In short, how the offeror treats the offeree's language will, assuming that treating the language either as language of acceptance or treating it as*

12

*language requiring further discussion is reasonable,*
*determine the language's effect.*

Id. at 330—31 (quoting 2 Williston on Contracts § 6:10 (4th ed. 2004)). So long as the offeror's interpretation of the offeree's equivocal acceptance is plausible or reasonable, New York courts will find a contract has been formed. "In other words, where an offeree communicates an ambiguous acceptance, the offeree must assume the risk of the offeror's misinterpretation." Id. at 331.

As Judge Learned Hand once explained: "'A contract has, strictly speaking, nothing to do with the personal or individual intent of the parties. A contract is an obligation attached by mere force of law to certain acts of the parties, usually words, which ordinarily accompany and represent a known intent.'" S.S.I. Investors Ltd. v. Korea Tungsten Min. Co., Ltd., 438 N.Y.S.2d 96, 100 (N.Y. App. Div. 1981) (quoting Hotchkiss v. Nat'l City Bank, 200 F. 287, 293 (S.D.N.Y 1911)), aff'd by 434 N.E.2d 242 (N.Y. 1982). Therefore, ours is an objective inquiry. We do not care about the "parties' after-the fact professed subjective intent." Cleveland Wrecking, 23 F. Supp. 2d at 292 (internal quotations omitted). Rather, in deciding whether parties have reached an agreement, we must look to the parties':

> [O]bjective intent as manifested by their expressed
> words and deeds at the time. . . .  In determining

whether the parties entered into a contractual agreement and what were its terms, "disproportionate emphasis is not to be put on any single act, phrase or other expression, but, instead, on the totality of all of these, given the attendant circumstances, the situation of the parties, and the objectives they were striving to attain. . . ."

Id. (quoting Reprosystem, B.V. v. SCM Corp., 522 F. Supp. 1257, 1275 (S.D.N.Y. 1981)). Therefore, "[w]hether an acceptance is ambiguous or equivocal . . . depends *not* on the subjective, undisclosed intent of the offeree, but rather on the offeree's words and actions as viewed from the perspective of a reasonable person." Johnson, 629 F. Supp. 2d at 330.

Finally, we must also note that "'[w]hile the existence of a contract is a question of fact, the question of whether a certain or undisputed state of facts establishes a contract is one of law for the courts.'" Gui's Lumber & Home Ctr., Inc. v. Mader Constr. Co., Inc., 787 N.Y.S.2d 555, 556 (N.Y. App. Div. 2004) (quoting Cortland Asbestos Prods. v. J. & K. Plumbing & Heating Co., 304 N.Y.S.2d 694, 696 (N.Y. App. Div. 1969)). More specifically, "questions as to what the parties said, what they intended, and how a statement by one party was understood by the other are questions of fact; however, the matter of whether or not there was a contract, in light of the factual findings on these questions, is an issue of law." Ronan Assocs. v. Local 94-94A-94B, 24 F.3d 447, 449 (2d Cir. 1994) (citing Four Seasons

14

_Hotels, Ltd. v. Vinnik_, 515 N.Y.S.2d 1, 6 (N.Y. App. Div. 1987)).

A.

Defendant argued in its Rule 50(b) motion before the district court that Plaintiff had failed to provide any evidence of Defendant's assent.  The district court did not see it that way, explaining:

> [I]n [Plaintiff's] testimony he says clearly and unequivocally that Mr. Nordlander accepted those terms, and that he reached an oral contract with the [D]efendant which incorporated those terms that he has stated.  He was asked, ". . . did Charles Nordlander ever say to you, did he in plain English say, yes, sir, I agree [Defendant] will share 50 percent of its profits?  Answer: Absolutely he did.  Absolutely."  There are statements like that throughout the record, where he said he told Mr. Nordlander what he wanted. . . .  I think that testimony where he says he made the proposal to [D]efendant, and Mr. Nordlander accepted it and agreed to it absolutely, indicates that the parties did have a meeting of the minds, they did reach a contract, as stated from the portions of the record I just quoted, and that [D]efendant breached that contract, because they did not pay to [P]laintiff the compensation therefore that they agreed to pay.

J.A. at 526–28 (quoting J.A. at 253–54).

On appeal, Defendant argues that Plaintiff's testimony that the district court relied upon (quoted above) constitutes conclusory assertions as to the legal meaning, or his own subjective interpretation, of Nordlander's statements during the June 3 phone call.  As a result, Defendant asserts such testimony cannot be relied upon to determine what it is

15

Nordlander actually said and whether any such statement objectively constitutes assent to Plaintiff's offer. Despite Plaintiff's repeated declaration that he and Nordlander had an agreement, Defendant claims that the only specific words of acceptance Plaintiff at trial ever attributed to Nordlander were "Okay, okay, I get it." Defendant contends that statement does not constitute unambiguous acceptance because it conveys at most that Nordlander understood the terms of the offer, not that he accepted the offer on behalf of Defendant. So, Defendant maintains a contract was never formed.

Context matters—a saying as old as time because it is true. Because we must view the evidence in the light most favorable to Plaintiff, we start with Plaintiff's evidence of the context of the June 3 phone conversation. According to Plaintiff's testimony, he and Nordlander discussed the pilot and making it into a series:

> A: And then [Nordlander] said, "All right, Richard," basically you know, "Can you do this again?" . . . . And I said, "Charles it's not for sale." And he said, "How much do you have in it?" And I went through the same thing again. "I've got 85,000 in it." . . . . His job is—I assumed was to acquire the show, because he said, "How much do you want?" And I said, "Charles, this is not for sale."
>
> ***
>
> A. And at one point, we started talking numbers, and he was talking about what—you know, how much did that house go for, how much did I spend, and at the time I remember projecting—his concern was that to make sure that that partnership was fair, and he was saying, "How much do you think you are going to spend?" And

16

the rough numbers that I remember was basically you know, they are going to have about $2 million in it, and that, you know, they want to make sure that I didn't, you know, come in on the light end. . . . But, you know, my rough estimate was that I was going to spend about $4 million . . . .

Id. at 147, 156—57.  The two agreed Defendant would hire a New-York based, third-party production company to film future episodes:

A:  And [Nordlander] said, . . . "I'm having a hard time getting these guys to let you—we like to have production companies that are right here that are real close that are in New York. . . .  I've got a company—there is two or three companies I want you to talk to. These guys are working on something for me right now. They are editors from HBO, and that's what they do."
***
So anyway, we started talking about how we were going to engage a third-party production company, and you know, threw out, like I said, a couple of names, and he wanted me to meet these guys and talk with them.

Id. at 148, 150.  They discussed the series' revenues. Plaintiff stated his belief that he thought the show would be profitable, but Nordlander disagreed:

A: But in this situation, it was, "Charles, it's not for sale.  I own this thing.  I have been—you know, I was told by somebody that this thing could make money."  And Charles said, "Richard, don't take this the wrong way.  Y'all did a really good show, but these kind of shows . . . don't make money."

Id. at 149.  Nordlander also explained that Defendant would not accept any risk of the real estate aspect of the series.

Q. Did you reach agreement concerning the real estate, the risk associated with acquiring and refurbishing real estate?

17

A. Absolutely. It was very firm from him that I was 100 percent on my own on that, that A&E would not have any of the risk, any liability. It wouldn't be on deeds. It had nothing to do with that. It was clearly, totally separate, and they did not want any of the liability, any financial obligation of the risk with that.

Id. at 156. "[Plaintiff] assured Nor[d]lander that [Defendant] would bear none of the financial risk (or reward) relating to the purchase and resale of the real estate." Aple. Resp. Br. at 4. Taking into account that concern, Plaintiff made the following proposal:

A. And, I said, "Charles, look, I'm a big boy. . . . I'll take that risk. But here's the deal. I will share revenue with you on this. This is my show. I'll do all the real estate . . . . All that risk is on me. I'll buy all the properties. I'll put all the employees on it. I will pay for everything. I'll do every bit of that." And then, you know, he talked about the production, how much I had into it. I told him 85,000, and he said it was unrealistic, that we probably had costs in there that we didn't take into account . . . but . . . if we were going to have a shot at this, and was going to be successful, then we had to keep the production costs down. And I don't recall the exact number, but I know it was below $150,000. . . . He said if we can keep that below there.

Id. at 150. "Under the proposed arrangement, [Defendant] would bear the cost of producing the show, and [Plaintiff] would track his out-of-pocket expenses related to production of the show. At the end of the season, the parties would subtract their expenses from the show[']s revenues and evenly divide any surplus." Aple. Resp. Br. at 5.

18

Q. Did you reach an agreement as to who was going to front the production costs?

A. Yeah. They—he actually called them in-house . . . but he said he would take care of his in-house guys and I would take care of stuff in the field, that basically, we would have this production company at our disposal.

Q. Okay. Did you reach an agreement with him concerning the production of the show?

A. Absolutely, we did.

Q. Okay. What was the terms of the agreement?

A. I was very forward. At this point I had nothing to lose. And I said, "Charles the show is not for sale. I will—I will partner this with you. We will split revenue. I will pay for my side. . . . Let's keep track of expenses, and then we chop it up in the middle, and then if it makes money, we split it. If it doesn't make money, I'm a big boy, I don't need anything out of it, and you know, I just don't make it."

***

Q. Okay. Let's go back through one at a time. Did you reach an agreement about anything relative to the production cost of the show?

A. Absolutely. Those guys—we would hire a third-party production company. They'd keep track of cost. They would front it, they would pay for it. And then at the end, whatever the cost would be, you know, we come out—and I remember hesitating, thinking, I stood for 85,000, he's putting 150 in there, if I could do what I can to keep that number down, we would come up better.

Q. Did you reach an agreement concerning your production costs?

A. Yeah. He basically said, "You keep track of it." . . . I would keep track of my out-of-pocket expenses, and I will throw that in at the end, my expenses, his expenses on the actual production of the show.

And then . . . once . . . everybody paid their expenses . . . if it didn't make any money, I didn't get anything . . . .

J.A. at 150—51, 155—56.

Nordlander responded to Plaintiff's proposal by warning Plaintiff again that shows of this kind do not make money. So they discussed how they could get this show to make money.

19

Q. How did he respond to that?
A. Well, he went through a couple of different things. He talked about shows not making money. . . . So we were kicking around different, different ideas on that, as far as how we could go out and generate, and make money on a show that he just told me these shows don't make money.

*** 

Q. Did you discuss with him how you were going to get revenue for the show?
A. Yeah. The different things between advertising and sponsors, and that we would, you know, collectively come up with a list of things that we felt that we could go out and generate money for this show, specifically.

Id. at 151–52, 158. "[Plaintiff] then provided Nor[d]lander with an illustration of these terms in the form of a lengthy recounting of a deal he had made with an investor in a hotel project." Aple. Resp. Br. at 5.

Q. All right. Can you go over for me what the terms of the agreement were?
A. Yeah. It was very simple. I actually used an example . . . I told him . . . "Charles, look, I'm a real estate guy. . . . [I]f I'm brokering the deal, I take a commission . . . . I used an example, I bought a hotel years ago in Mount Pleasant. I bought it out at a foreclosure sale, and I bought it for $2.1 million. . . . So I called this gentleman up . . . . And I said, "You know, if you can give me the money, you know, I will take care of everything on my side, I'll buy it, I'll fix it up and sell it, we split the profits."

*** 

A. And I said, "So, Charles, just to show you what a good partner I am, on doing deals, here is what happens." We needed $2.1 million. I only needed five percent. The next day, I went and bid on the property. I got it. I needed my five percent. He wired it down. . . . And so he had obligated, he was committed, fully ready, willing and able to send me down 2.1 million. I ended up not even having to take it. We took our piece of paper and we sold our

20

position to Red Roof Inn. . . . I said, "We took that, we took the profits, we paid our expenses." We had . . . seven or eight checks that we paid expenses first, and then we took what was left over and we chopped it in half, and he got his check and I got mine. And used that as an example for Charles.

Id. at 153–55. Nordlander reiterated his concern that Plaintiff's proposal might not be beneficial for Plaintiff.

A. And Charles was concerned for me that this show was not going to make any money, and I was going to end up with nothing, and that I ought to take a sure thing, and I said, "Nope, that's not what I'm doing. I'm not selling the rights to my show." Very firm. . . . I went into a long drawn-out example of exactly how to split it.

J.A. at 155. "Nor[d]lander agreed to the terms, saying, 'Okay, okay, I get it,' although he remained concerned that the agreement was not fair to [Plaintiff]." Aple. Resp. Br. at 5–6. This statement by Nordlander is discussed in greater detail, infra. They also discussed credits for the series.

Q. Did you reach any agreement with him concerning about credits, relative to the series?
A. We did. Because he talked about the pilot. He looked at it, and right when it played on the pilot, the very first line up there said, executive producer, Richard C. Davis.
And he told me, tiptoed around it and was saying, "Look, you know, that's not going to go. . . . [W]e are going to get them some cheap labor, because we are going to give them a credit. They are going to be the producers. You are going to be the creator."
And I said, "Fine with me. Absolutely. No problem."

J.A. at 157. So, according to Plaintiff, by the end of their June 3 phone conversation he and Nordlander had formed a

21

contract to make a television series based upon his pilot and split the resulting profits equally.

> Q. Did you reach agreement with Charles Nor[d]lander to split revenue?
> A. Absolutely. We reached an agreement on splitting revenue. He—I felt he was genuinely concerned that I was cutting a bad deal.
> Q. What was the split on revenue?
> A. It was right down the middle, 50/50. You take your half, I'll take my half.

Id. at 157—58.

On cross examination, Plaintiff testified Nordlander specified one condition on the agreement going into effect—approval by Defendant's board of directors.

> Q. Mr. Davis, there was no commitment by A&E in that phone call to actually make a television show?
> A. No, sir. It was contingent on board approval.
> Q. There was no agreement in the phone call to actually make a television show, correct, sir?
> A. It was an agreement, yes, sir.
> Q. There was no agreement to actually make the television show, correct, sir?
> A. Yes, sir.
> Q. Yes, there was no agreement?
> A. I see what you are saying. Yes, sir.

Id. at 248. Plaintiff also explained exactly what Nordlander said in the phone conversation that led him to believe Nordlander had said "in plain English" that Defendant, pending board approval, would make the proposed television show and split the resulting profits equally.

> Q. Mr. Davis, did Charles Nor[d]lander ever say to you, did he in plain English say, yes, sir, I agree, A&E will share 50 percent of its profits?
> A. Absolutely he did. Absolutely.

Q. Mr. Davis, let's look at what you said in your deposition . . . .

(Thereupon, the video was played as follows:)

Q. Please tell me specifically as possible exactly what Charles Nor[d]lander said to you that made you think that you had a promise of a 50/50 partnership on the revenue streams.

A. He understood, he totally agreed 100 percent that they weren't going to have to write me a check. He wanted to know how much we wanted for a show. We went through the whole discussion, and I said it's not for sale, it's for partnership.

And I explained that whole concept on the whole real estate deal. There was no way he could misunderstand.

***

Q. Please just tell me as specifically as you possibly can what words Charles Nor[d]lander said that made you think you had this deal on a 50/50 revenue split.

A. When I laid out my real estate example once again. I laid it out for him, the basis.

Q. What did he say?

A. I just told you that. I just told you that. I went through that whole example, and I said, "It's not for sale. It's not for sale. I'll—I want to be a hero to the network."

And Charles said, *"Okay, okay, I get it."*

(Thereupon, the video stopped playing.)

BY MR. FEIGELSON:

Q. So, Mr. Davis, you laid out a real estate example?

A. Where I split the revenue as 50/50.

Q. Laid out a real estate example. Sir, just answer the question. You laid out a real estate example, correct?

A. Correct.

Q. And you used the word "partner," correct?

A. Correct.

Q. And you told Charles you wanted to be a hero to the network, correct?

A. Absolutely.

*Q. And he said, "Okay, I get it," correct?*

*A. Yes, sir.*

Q. And on that basis, you thought you had made a binding agreement with A&E to divide up 50/50 all the profits from the television show?

A. It—to this day, absolutely, yes, sir.

23

J.A. at 253—59 (emphasis added).

Plaintiff testified over and over again in unequivocal terms as to his interpretation or characterization of his June 3 phone conversation with Nordlander. He repeatedly declared they "absolutely" had a deal. Consequently, we accept, as we must, that Plaintiff subjectively believed by the end of his June 3 phone conversation with Nordlander he had a deal with Defendant to make a television show and to split the revenues equally. But, our review of the record makes clear that Plaintiff was only able to specify one statement of acceptance by Nordlander: "Okay, okay, I get it." We take Plaintiff's word for it, as we must, that Nordlander said "Okay, okay, I get it."[6] We can safely say that statement does not objectively convey unambiguous and unequivocal acceptance of Plaintiff's offer. We cannot say, however, that such a statement made in a certain tone of voice or in a given context could not plausibly mean "I accept." As we explained, if Plaintiff reasonably or plausibly

---

[6] This is also why the subsequent emails between Plaintiff and representatives of Defendant in which Plaintiff refers to his "deal," "contract," or "partnership" with Defendant are irrelevant to the present inquiry. None of those emails indicate what Nordlander said in the June 3 phone conversation to accept Plaintiff's offer. Rather, they reflect what we have already accepted as true—that Plaintiff believed he had reached an agreement with Nordlander in that June 3 phone conversation to make a television series and split the resulting profits equally.

24

understood Nordlander's equivocal statement as an acceptance, then a contract was formed. Therefore, we must decide whether Plaintiff has presented sufficient evidence from which a jury could conclude that a reasonable person would have interpreted Nordlander's statement as an acceptance.

Plaintiff's testimony reveals that he and Nordlander extensively negotiated, discussing production costs, production crew, production credits, real estate risk, raising revenue, and splitting revenue, among other things. Nordlander stated his deal-breaker—bearing any risk for the real estate—and the one condition on going forward with production of the series—board approval. And, Plaintiff stated his deal-breaker—splitting all revenue equally—numerous times in various ways, even illustrating this term of his offer with a lengthy recounting of a prior deal. To this, Plaintiff testified Nordlander said "Okay, okay, I get it." He also testified Nordlander said their making the television series was contingent on board approval. Tellingly, accordingly to Plaintiff, Nordlander did not indicate their deal was contingent on anything else or give any indication that Defendant would not accept a fifty-fifty split of revenue, only that such a split would likely not be a beneficial arrangement for Plaintiff. Furthermore, no evidence suggests Nordlander explained that the board would only approve the series and the money to produce the series without approving

the agreement to split net profits equally. And, Defendant eventually notified Plaintiff that "[t]he board approved the money for our series." J.A. at 625. Though the board approved the making of the show, it seems undisputed that the board neither considered nor approved any revenue sharing agreement. Nothing in the record suggests that any of Defendant's representatives conveyed to Plaintiff that the board approved "money for our series," but did not approve a fifty-fifty agreement. From this evidence, a reasonable jury could conclude a reasonable person in Plaintiff's position after such extensive bargaining could plausibly interpret "Okay, okay I get it," in conjunction with the statement that the only condition is board approval, as acceptance.

In addition, there is sufficient, though not unequivocal, evidence from which a reasonable jury could conclude that Plaintiff objectively treated Nordlander's statement as an acceptance of his offer to make a television series and split the revenues equally. Plaintiff allowed himself and his company to be the subject of thirteen television shows made by Defendant. Plaintiff testified that he worked hard to obtain sponsors and advertisers for the show. J.A. at 181. He also coordinated with Defendant on using certain products in the course of business to take advantage of product placement opportunities, thereby increasing the show's revenue. Id. at

26

182—86.   In an e-mail to one of Defendant's representatives, Plaintiff expressed his frustration in not having been presented with a written agreement that reflected his conversation with Nordlander:   "I was asked up front how much I wanted for the show and I told Charles then 'I don't want to sell, I want to partner and share the risk and return' because I knew this would be a hit . . . .  I envisioned a partnership, it feels more like indentured servant at this point."  Id. at 706.  He said in an e-mail to a representative of the third party production company "Charles isn't [employed by Defendant] anymore but that doesn't change the deal he and I cut prior to me even meeting you guys. . . .   If you guys are participating with advertising, sponsorship, dvd sales, ectm [sic] without us, that was not what I was promised."  Id. at 698.  In addition, Plaintiff testified he attempted to get a written confirmation of his agreement with Nordlander from one of Defendant's representatives.  During one of those discussions he reiterated that his "deal was 50/50." J.A. at 218.   The representative's notes from that discussion reflect Plaintiff told her of his expectation of a fifty-fifty split.  J.A. at 766.

Naturally, Defendant points to other statements by Plaintiff that it claims are inconsistent with his claim to have

made a revenue-sharing agreement.[7]  We acknowledge that is a plausible, reasonable interpretation of those communications. But, Plaintiff also proffers another reasonable interpretation. Plaintiff testified those statements referred to the "production and talent" aspect of his role in the series, which was separate from his agreement to share revenues.  Plaintiff additionally argues that the jury could also have believed he and Defendant were renegotiating their agreement for season two.  That would seem to have been the case, given that the jury awarded Plaintiff half of only the first season's profits.  And, as Plaintiff correctly notes, the jury was entitled to reject some portions of his testimony, while accepting other portions.  See In re Dana Corp., 574 F.3d 129, 152 (2d Cir. 2009) ("But a jury is free to believe part and disbelieve part of any witness's testimony.").  Moreover, we "must disregard all evidence favorable to the moving party that the jury is not required to believe."  Reeves, 530 U.S. at 150.  None of the evidence Defendant has pointed to requires our belief.

## B.

Even if Plaintiff and Nordlander agreed orally, Defendant argues the agreement is unenforceable for indefiniteness because

---

[7]  Defendant refers to statements Plaintiff made to investors, representatives of Defendant, and other television networks. Aplt. Op. Br. at 24.

28

Plaintiff and Nordlander did not discuss let alone agree on the following "material" terms: (1) the categories of revenue that would be included in "net revenue," (2) the categories of expenses that would be deducted from "net revenue," (3) the duration of the agreement, (4) the grounds for termination, or (5) the identities of the parties.

"Under New York law, no contract exists, nor may one be implied, where parties do not agree to its material terms." Cleveland Wrecking, 23 F.Supp.2d at 292 (internal quotations omitted). Courts do not relish refusing to enforce agreements for indefiniteness; but:

> [I]f the terms of the agreement are so vague and indefinite that there is no basis or standard for deciding whether the agreement had been kept or broken, or to fashion a remedy, and no means by which such terms may be made certain, then there is no enforceable contract. Moreover, there [can be] no contract if the parties [have] fail[ed] to agree on all essential terms, and if the missing terms cannot be supplied through reasonable construction that is consistent with the parties' intent.

Best Brands Beverage, Inc. v. Falstaff Brewing Corp., 842 F.2d 578, 588 (2d Cir. 1987) (applying New York law) (internal quotations and citations omitted). Nonetheless, "[s]triking down a contract as indefinite and in essence meaningless 'is at best a last resort.'" 166 Mamaroneck Ave. Corp. v. 151 E. Post Rd. Corp., 78 N.Y.2d 88, 91 (1991) (quoting Cohen & Sons v.

29

Lurie Woolen Co., 232 N.Y. 112, 114 (1921)). The Court of Appeals of New York has warned:

> Contracting parties are often imprecise in their use of language, which is, after all, fluid and often susceptible to different and equally plausible interpretations. Imperfect expression does not necessarily indicate that the parties to an agreement did not intend to form a binding contract. A strict application of the definiteness doctrine could actually defeat the underlying expectations of the contracting parties. Thus, where it is clear from the language of an agreement that the parties intended to be bound and there exists an objective method for supplying a missing term, the court should endeavor to hold the parties to their bargain.

Id.

As to the categories of revenue and expenses, the district court explained the parties' agreement was simple and clear:

> [Plaintiff] didn't want to sell the show, he wasn't going to sell the show, he was responsible for the real estate, he'd put the people there to produce the show, he paid his expenses, [Defendant] paid [its] expenses, they deduct those expenses, and then split the profits fifty-fifty. If he said that from the stand, he said it 25 times. As far as expenses are concerned, I mean, he bought 44 tickets . . . to the World Series. And [Defendant] rejected those, because . . . . [t]hey were not related to the project. So I think it's easy to assume, and I think the parties dealt with this assumption, that the expenses were to be those reasonably incurred in connection with the production of the show. And that's how they acted. So the fact that they didn't have some formula, that [Plaintiff] didn't propose some formula in his proposal to [Defendant] for arriving at expenses is unimportant. I think it's clear that those expenses can be computed without any difficulty. And it can be determined which are reasonably related to the production, and therefore, deducted before the profits are split.

J.A. at 524–25. Plaintiff also testified all revenue generated by the airing of the show would be included in the contract's "revenues." He explained that their agreement did not differentiate revenue from advertising during the show by companies that had previously done business with or already bought advertising from Defendant from other forms of revenue generated by the show. J.A. at 266—68. All can reasonably mean all, without having to list every item included in all. We therefore conclude sufficient evidence exists from which a reasonable jury could find that the parties reached an agreement with sufficiently clear definitions of expenses, revenue, and "net profits."

Contrary to Defendant's assertion, Plaintiff testified that he and Nordlander discussed the duration and termination of their enterprise. Plaintiff testified he and Nordlander agreed in their June 3 phone conversation that the series was subject to renewal each year based upon the ratings the series received and could have been canceled at any point by Defendant, though Plaintiff admittedly hoped the show would continue indefinitely. Id. at 263—64. Aside from deciding not to renew the series at the end of each season based on its ratings, Plaintiff concedes he and Nordlander did not discuss the exact circumstances under which either party could cancel the agreement. Id. at 262. Nonetheless, Plaintiff testified they agreed Defendant could

31

cancel the show at any time. Id. at 264. From this evidence, a jury could reasonably conclude the parties agreed the series would continue as long as it was successful, *i.e.*, received ratings, Plaintiff promised to continue as long as Defendant did not terminate the show, and Defendant possessed the right to terminate at will. Plaintiff also contends that if Defendant could terminate at will, it is objectively reasonable to assume so could he, of course, subject to the implied covenant of good faith and fair dealing. Either understanding is reasonable, sufficiently definite, and consistent with the parties' ultimately actualized intent to make a reality television series together. Therefore, Plaintiff presented sufficient evidence upon which a jury could conclude the parties agreed upon duration and termination of their agreement.

As to the identity of the parties to the contract, Defendant does not actually make an argument other than to declare in a single sentence the contract was fatally indefinite as to who the parties were. Wahi v. Charleston Area Med. Ctr., Inc., 562 F.3d 599, 607 (4th Cir. 2009) (explaining that a party's single declarative sentence, without citations to authorities or the record, is insufficient to raise an argument on appeal). Regardless, sufficient evidence exists from which a jury could conclude Defendant knew who Plaintiff was and that Plaintiff's real estate flipping business organization was

32

called Trademark Properties. <u>See</u> J.A. at 590 (Nordlander explaining that Plaintiff made clear to him that Plaintiff wanted to take his real estate company, Trademark, national). Defendant provides no argument or authority as to why it is material to the oral contract whether Nordlander agreed on behalf of Defendant to do business with Plaintiff or Trademark or both.

C.

Defendant contends that New York law holds that contracts that are sufficiently novel and complex must be in writing to be enforceable and that this agreement is one such contract. In addition, Defendant maintains that Plaintiff's repeatedly-asserted expectation that their agreement be reduced to writing proves that the parties only intended to be bound by a writing.

Defendant's statement of New York law is not entirely correct. We can find no case, nor has Defendant cited one, in which a New York court declared that as a matter of law a contract was so novel and complex that it had to have been in writing to be enforced. Instead, under New York law whether an oral agreement in the absence of a writing is binding depends on the parties' objectively-manifested intent. <u>Winston v. Mediafare Entm't Corp.</u>, 777 F.2d 78, 80 (2d Cir. 1986). And, the sole case Defendant cites on this point makes clear that to discern that intent, we consider a number of factors, including:

33

> (1) whether a party has made an "explicit statement that it reserves the right to be bound only when a written agreement is signed," (2) "whether one party has partially performed," (3) "whether there was literally nothing left to negotiate or settle, so that all that remained to be done was to sign what had already been fully agreed to," and (4) *whether the agreement concerns those complex and substantial business matters where requirements that contracts be in writing are the norm rather than the exception.*"

Braun v. CMGI, Inc., 64 F. App'x 301, 303 (2d Cir. 2003) (quoting R.G. Group, 751 F.2d at 75–76 (applying New York law)) (emphasis added). "No single factor is decisive, but each provides significant guidance." R.G. Group, 751 F.2d at 75. Therefore, contrary to Defendant's assertion, "whether the agreement concerns those complex and substantial business matters where requirements that contracts be in writing are the norm" is just one factor the fact-finder considers in deciding whether the parties intended to be bound without a written document. Id. at 76; see also Consarc Corp. v. Marine Midland Bank, N.A., 996 F.2d 568, 576 (2d Cir. 1993) (explaining that these factors guide the fact-finder's determination of the parties' intention to be bound without a writing).

First, Defendant contends because the alleged contract in this case "involved potentially millions of dollars, was a sharp departure from [its own] and industry practice . . . and by [Plaintiff's] own account could run for decades . . . . [a] writing therefore was legally necessary to bind the parties."

34

Aplt. Op. Br. at 42. We agree that the contract involved a "substantial business matter" and it may well not have been Defendant's typical practice to split revenues. But we also note a reasonable jury could find that the contract at issue was not so complex. Hiring a third-party production company, adding all revenue, subtracting all reasonable expenses, splitting the remainder in two, and renewing each year depending on the show's ratings are easy enough concepts to understand. The jury could have also considered Defendant's demonstrated willingness to produce, pay for, and air a television series—a substantial business matter even without any agreement to share revenue—without a written contract.

Second, Defendant argues "[t]he evidence that the parties intended and attempted to reach a written agreement strongly confirms that the purported oral agreement was unenforceable" without a writing. Aplt. Op. Br. at 43. Again, Defendant cannot escape the fact that by its own admission it undertook to develop and air a television series featuring Plaintiff without a written contract. It is not such a far leap from that fact to infer that Defendant and Plaintiff also intended to be bound by their oral agreement as to how to compensate Plaintiff without a written contract. There is also no evidence that Nordlander or any other of Defendant's representatives ever stated Defendant would not be obligated to Plaintiff without a formally executed

35

document. Furthermore, we agree with the district court that the jury could have reasonably concluded from the trial testimony that Plaintiff "thought he had an oral contract, but expected a written contract. . . . [M]ost people feel more comfortable with a written contract than with an oral contract. And I think that based upon his testimony, which the jury could have believed, he was promised a written contract by Mr. Nordlander, and he thought he was going to get one." J.A. at 525. That a party wants an oral contract reduced to writing does not necessarily mean the parties did not intend to be bound until such reduction; it may just reveal that the party wants to avoid a "he said, she said" argument down the road as to what the parties orally agreed. See Winston, 777 F.2d at 80 ("This freedom to contract orally remains even if the parties contemplate a writing to evidence their agreement. In such a case, the mere intention to commit the agreement to writing will not prevent contract formation prior to execution.").

D.

Defendant claims that two releases Plaintiff signed entitle it to judgment as a matter of law because the language of these releases protects it from Plaintiff's breach of contract claim. "The meaning and scope of a release must be determined within the context of the controversy being settled, and a general release cannot be construed to cover matters which the parties

36

did not desire or intend to dispose of."  In re Brown, 885 N.Y.S.2d 222, 223 (N.Y. App. Div. 2009) (internal quotations and citations omitted).

Plaintiff signed two releases after the June 3 phone conversation, but before he filed suit.  The "Standard Location Release" grants Departure (the production company that filmed and edited the episodes) and its assigns the right to "record as desired the premises located at Trademark Properties" and to "exhibit, display and transmit . . . all or any portion of the Footage" and indemnifies Departure and its assigns "from and against all claims, losses, costs, expenses, settlements, demands, and liabilities of every kind . . . arising out of or incurred by reason of use of the Footage in accordance herewith or the inaccuracy, alleged breach or actual breach of any representation, warranty, covenant, agreement . . . made herein."  J.A. at 690.  The "Standard Personal Release" grants Departure and its assigns "the irrevocable right and license to use [Plaintiff's] name and biographical material concerning [Plaintiff], and the right to exhibit, distribute, transmit, display . . . edit, alter and modify any video tape . . . made by . . . Departure Films . . . of [Plaintiff's] likeness . . . made by [Departure] . . . without additional compensation to [Plaintiff]" and releases Departure and its assigns from "all claims . . . arising out of the production, exhibition,

37

distribution, promotion and/or advertising of 'untitled project' . . . including without limitation, any claim for defamation, slander or invasion of privacy." J.A. at 691. It is undisputed that Departure subsequently assigned all of its rights to Defendant. These documents only release Defendant from any claims Plaintiff might have arising from the display of the footage of Trademark's premises (the Location Release) and the "production, exhibition, distribution, promotion and/or advertising" of the show (the Personal Release). Thus, the releases do not immunize Defendant from liability for breach of the parties' contract to share revenues.

IV.

Now, we turn to Defendant's contention that the district court's incorrect jury instructions and evidentiary rulings entitle it to a new trial pursuant to Fed. R. Civ. P. 59. We review the district court's denial of a motion for a new trial and its rulings on the admissibility of evidence for abuse of discretion. See Figg v. Schroeder, 312 F.3d 625, 641 (4th Cir. 2002) ("We review for abuse of discretion a district court's denial of a motion for new trial . . . under Fed. R. Civ. P. 59."); Schultz v. Capital Intern. Sec., Inc., 466 F.3d 298, 310 (4th Cir. 2006) ("We review a district court's evidentiary rulings for abuse of discretion."). "A trial court's exercise

of such discretion is entitled to substantial deference, and will be upheld so long as it is not arbitrary or irrational." United States v. Myers, 589 F.3d 117, 123 (4th Cir. 2009) (internal quotations and citations omitted). But, "[u]nless justice requires otherwise, no error in admitting or excluding evidence . . . is ground for granting a new trial . . . . At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights." Fed. R. Civ. P. 61. We only grant a new trial when we can say "'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was . . . substantially swayed by the error, [therefore] it is impossible to conclude that substantial rights were not affected.'" Bank of Montreal v. Signet Bank, 193 F.3d 818, 834 (4th Cir. 1999) (quoting Kotteakos v. United States, 328 U.S. 750, 765 (1946)).

A.

Defendant claims the district court should have admitted Paragraph 11 of Plaintiff's complaint, pursuant to Fed. R. Evid. 801(d)(1)(A) and 801(d)(2)(A). According to Defendant, Paragraph 11 states Plaintiff made the alleged oral agreement in an in-person meeting with Nordlander and another representative of Defendant, witnessed by a representative of Departure Films. Defendant maintains Paragraph 11 is inconsistent with

Plaintiff's testimony that the contract was formed during his June 3 phone conversation with Nordlander and therefore "key evidence that discredited" Plaintiff's account. Aplt. Op. Br. at 51. Plaintiff objected to its admission. The district court ruled it inadmissible because it was not clearly adopted by Plaintiff and not clearly inconsistent with his trial testimony. J.A. 307—08.

Even if the district court erred in deciding the complaint did not satisfy the requisites for admissibility, we conclude the error was harmless. Defendant impeached Plaintiff on the same point through the introduction of Plaintiff's answer to Interrogatory Number 9 and his deposition testimony. Defendant asked Plaintiff at trial about his answer to Interrogatory 9 in which he stated:

> The agreement was reached and discussed between Charles Nor[d]lander with [Defendant] and [Plaintiff]. A conference call was then held between Charles Nor[d]lander, Thomas Moody, Nancy Dubuc, and Richard C. Davis at which time it was agreed that the Plaintiffs and the Defendant . . . would be equal 50/50 partners of [Plaintiff's] concept and treatment . . . and would share equally in all net revenues and proceeds generated from the exploitation of the series.

Id. at 811; see also id. at 269—70 (defense counsel cross-examines Plaintiff about his interrogatory answer). Defendant also played at trial a part of Plaintiff's videotaped deposition testimony during which Plaintiff stated about the conference

40

call, "'I remember that being the defining moment of when I struck this deal with [Defendant].'" J.A. at 276. This evidence contradicts Plaintiff's trial testimony that the revenue-sharing contract was formed during the June 3 telephone conversation with Nordlander. Therefore, the admission of Plaintiff's complaint would have only reiterated Plaintiff's conflicting account.

## B.

In support of its defense that Nordlander and Plaintiff never made a revenue-sharing contract, Defendant sought to introduce testimony from Nordlander and two of its other employees to the effect that reality television stars never receive revenue-sharing contracts. Defendant argues that their testimony is not "expert" testimony but "factual context." As such, Defendant claims the witnesses should have been able to "'offer an opinion on the basis of relevant historical or narrative facts [they have] perceived'" without being deemed "experts." Aplt. Op. Br. at 57 (quoting MCI Telecomm. Corp. v. Wanzer, 897 F.2d 703, 706 (4th Cir. 1990) (internal quotations and citations omitted)). Plaintiff objected to this testimony and the district court sustained this objection on the basis that these individuals had not been designated as experts pretrial and so could not testify as to industry practice. In summary, the district court ruled as to all three of the

controverted witnesses' opinions: "[T]his witness was not disclosed as an expert. He has been asked to express an opinion as to a certain practice prevailing or not prevailing in the industry in which he works, and he cannot do that." J.A. at 363.

A witness testifying not as an expert must limit his opinion testimony: "to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. Defendant did not seek to admit solely the witnesses' lay opinion testimony based on "records kept by [them] personally under [their] control," and "predicated on [their] personal knowledge and perception." Wanzer, 897 F.2d at 706. Rather, Defendant sought to admit the witnesses' specialized knowledge as to the entire television industry. Defendant was certainly entitled to present testimony regarding its own standard practices and each witness was allowed to testify that based upon their experience and knowledge of historical facts no one had ever made a fifty-fifty revenue sharing deal with Defendant. Therefore, the district court did not abuse its discretion in deciding that to present any specialized knowledge of the television industry, the

42

Defendant should have disclosed and qualified these witnesses as experts.

## C.

Defendant next argues the district court improperly allowed Plaintiff to testify that he "owned" the television series and that Defendant stole it from him despite Defendant's objections and incorrectly refused to issue a curative instruction on the subject to the jury.[8] The district court overruled Defendant's objection to that testimony because "the word 'own' has a common meaning, and . . . when [Plaintiff] makes that expression, that's expressing his intent, and his understanding of the status of the pilot [episode]. . . . [H]e has a perfect right to testify to that."  J.A. at 170-71.  And, the court told the jury:

> What counsel is saying is that when he says he owns
> it, that's a legal conclusion, and he may own it and
> he may not own it legally.  And the reason I let him
> testify to it is because that's what he says because
> he thinks he owns it, and he expressed that thought in
> his conversation.  I'm not sure what will develop in
> this case at any later period of time.  It may be that
> the question of ownership is a serious issue that you
> have to decide.  And if it does become an issue that

_____

[8] The substance of Defendant's arguments as to the court's failure to sustain its objection and issue its requested jury instruction on Plaintiff's statements as to ownership and theft of the show are the same.  We review both claims of error for abuse of discretion.  S. Atl. Ltd. P'ship v. Riese, 284 F.3d 518, 530 (4th Cir. 2002). Therefore, we treat both issues simultaneously in this section.

43

you have to decide, then I may be required to charge you the law as to ownership, and what it takes for someone to own a property such as this. And if that is the case, then you can decide that issue of ownership if it becomes necessary. And the fact that this witness has said he owned it, and I let him testify to it, may or may not be critical as to that issue, if we do get to that issue and if you are called upon to decide it. So it's a legal conclusion that you may have to decide, and if you do, I'll give you the law upon which you can decide it, you finding the facts. But if it's not a legal conclusion, and that has to be decided, and he can express his opinion about it, then his testimony can come in. Okay? I don't mean to confuse you, but I can't predict exactly what's going to happen in the case. And if ownership does become a legal issue, then I will submit that issue to you to decide, based upon applicable law. Okay?

Id. at 171–72. Defendant requested a jury instruction that Plaintiff's statements as to ownership and theft are irrelevant to Plaintiff's contract claim. The district judge rejected the charge, explaining:

[M]y charge says nothing about ownership. It says to prove a breach of contract, you've got to prove this, this, and this. . . . [Plaintiff] inserted those words [of ownership and theft], but ownership is not necessary . . . I'm going to tell them what he has to prove, and he doesn't have to prove ownership.

Id. at 438–39.

The district court did not abuse its discretion in either failing to sustain Defendant's objection or refusing to give the requested curative instruction. The court informed the jury that it would let the jury know if ownership was an issue it needed to decide and that if it was not, then Plaintiff's

44

statements on the subject were essentially irrelevant. When the court did not instruct the jury on ownership it was left to decide the only issue it was given instructions to decide—the contract claim. Moreover, we can infer from the jury's award of half of only the first season's profits, rather than an "owner's" half of all seasons' profits, that it was not influenced by Plaintiff's allegations of ownership.

### D.

Defendant next complains the district court erroneously failed to instruct the jury on the requirement of "specific words of assent." Id. at 439–40. "We review challenges to jury instructions for an abuse of discretion." S. Atl., 284 F.3d at 530. "Instructions are adequate if 'construed as a whole, and in light of the whole record, [they] adequately [inform] the jury of the controlling legal principles without misleading or confusing the jury to the prejudice of the objecting party.'" Id. (quoting Spell v. McDaniel, 824 F.2d 1380, 1395 (4th Cir. 1987)). Even if we detect error, we do not reverse "unless the error seriously prejudiced the challenging party's case." Id.

Defendant submitted thirty-six proposed jury instructions. Then at trial, Defendant's counsel orally requested another jury instruction to the effect that under New York law formation of an oral contract requires "specific words of assent" based upon two cases, Gomez v. Bicknell, 756 N.Y.S.2d 209 (N.Y. App. Div.

2002), and Agric. Ins. Co. v. Matthews, 749 N.Y.S.2d 533 (N.Y. App. Div. 2002). Defendant did not submit to the district court a copy of the specific instruction it requested on this issue. See J.A. at 439–40 ("Your Honor, the last thing we would request is a charge that we don't have a specific charge for, but is incorporated in the Gomez case, and the Agricultural Insurance Company that I passed up, which is an oral contract in New York, there was a requirement for specific words of assent."). Nor does it provide the text of this hypothetical instruction on appeal. The joint appendix on appeal only provides two pages of the transcript of the discussion of this proposed instruction which does not reveal how the court ultimately ruled on the instruction (though we can tell by the instructions it did give, it refused to give this requested instruction) and, more importantly, why it so ruled. Nonetheless, Defendant argues on appeal its requested instruction was necessary because without it the jurors were free to conclude, allegedly contrary to New York law, "that they could recognize a contract by cherry-picking Plaintiff's conclusory statements about the existence of an agreement while disregarding all of Plaintiff's contradictory admissions and writings." Aplt. Op. Br. at 49.

The district court instructed the jury there are three essential elements to the formation of a binding contract:

46

First, that there is a contractual intent on the part of all parties to the contract . . . both of those people have got to have an intent, a desire to enter into a contract. You don't enter into a contract by accident. . . . And the second essential element is . . . an actual meeting of the minds of the parties. . . . In other words, they agree on all of the elements of the contract. You can't have a contract if you don't agree on everything. . . . Now, there are some contracts in our law that must be in writing. . . . But this is not such a contract . . . and this one can be agreed upon, can be made, can be made to the point of being enforced if it is oral, or partially oral and partially written. But there has to be an offer and an acceptance for there to be a contract.

J.A. at 460–61. As our extensive discussion of the requirements for contract formation under New York law make clear, the district court's instructions on acceptance and mutual assent to material terms are adequate and do not misstate New York law.

E.

Lastly, Defendant challenges the district court's response to a jury question. During its deliberations, the jury asked: "Do we need to determine that there is a revenue sharing contract between the two parties? Do we need to determine that there is a 50/50 revenue split contract between the two parties?" The district court responded by explaining that it:

[D]idn't suggest any particular type [of] contract to you. And [it] didn't do that because that's really not part of the law; that's a part of the facts. But I did say to you that when you considered this first element, the existence of a contract, and if you find that [P]laintiff has proven the existence of a contract . . . then you will know what that contract provides. . . . [I]f he has proven it, you know what

47

it is; you know whether it's a 50/50 split; you know whatever the evidence supports. And I can't tell you you have to find a particular kind of contract because that's just not my job.

Id. at 470–71.

"We review a district court's decision to respond to a jury's question, and the form of that response, for an abuse of discretion." United States v. Foster, 507 F.3d 233, 244 (4th Cir. 2007). "'[I]n responding to a jury's request for clarification on a charge, the district court's duty is simply to respond to the jury's apparent source of confusion fairly and accurately without creating prejudice.'" Id. (quoting United States v. Smith, 62 F.3d 641, 646 (4th Cir. 1995)). "An error requires reversal only if it is prejudicial in the context of the record as a whole." Id.

Defendant argues the district court abused its discretion by not directly answering the questions asked and failing to say that the 50/50 profit share as contended by Plaintiff was the only agreement the jury could possibly recognize. By failing to answer the questions, Defendant claims the district court essentially invited the jury to craft its own version of a contract—which is what it claims the jury did by awarding only half of the revenue from the first season to Plaintiff, rather than awarding half of the revenue of all three seasons to which Plaintiff asserted he was entitled.

48

First, the district court's answer did not misstate the law or the facts. Second, its answer did not invite the jury to "craft" its own contract, but it did properly remind the jury that only the jury could "find" or "determine" whether a contract existed and, upon the basis of that conclusion, decide what the terms of the contract were. And, lastly, the jury was free to believe parts and disregard parts of Plaintiff's testimony and evidence. Based on the jury's verdict, it likely concluded based upon Plaintiff's testimony and other evidence that the parties had agreed to split equally the show's revenues, but disregarded other parts of Plaintiff's testimony and evidence in deciding that Plaintiff was not entitled to half of the revenue from the second and third seasons because the parties had only reached an agreement as to the first season.

## V.

For the reasons herein, we affirm the district court's denial of Defendant's motions for a judgment as a matter of law and a new trial.

AFFIRMED

49

DUNCAN, Circuit Judge, dissenting from the judgment:

I am in full agreement with the majority's conclusion that Mr. Davis deserves to be compensated for the services he indisputably provided A&E Television Networks. Davis's position is made all the more sympathetic by the fact that A&E bears significant responsibility for the failure to reduce a contract memorializing its understanding to writing.

Moreover, it certainly appears that Davis had viable claims. He could have brought an action in quantum meruit. As the majority recognizes, Davis also asserted acceptance by conduct, on which the district court, inexplicably, declined to instruct. Unfortunately, however, the jury was not asked to find facts undergirding either such theory.

We are thus left with the contention that Nordlander's statement, "Okay, okay, I get it," J.A. at 258, constitutes "clear, unambiguous and unequivocal" acceptance, IBM Corp. v. Johnson, 629 F. Supp. 2d 321, 330 (S.D.N.Y. 2009), which is simply not the law. The majority's reliance on Johnson for its conclusion that "if [Davis] reasonably or plausibly understood Nordlander's equivocal statement as acceptance, then a contract was formed," (Maj. Op. at 24) runs contrary to the basic legal principles underlying contract formation. Contracts require mutual assent, and a unilateral understanding, by definition, cannot meet that requirement.

50

Because I do not believe a reasonable person would interpret "Okay, okay, I get it," alone as acceptance, or indeed as anything other than "I understand what you are saying," I must respectfully dissent.